In the Matter of the Application for a Compulsory Accounting in the Estate of CAROLINE W. FRAME, Deceased.*

In the Matter of the Judicial Settlement of the Intermediate Account of Proceedings of CENTRAL HANOVER BANK AND TRUST COMPANY and Another, as Executors, etc., of CAROLINE W. FRAME, Deceased.

In the Matter of the Estate of CAROLINE W. FRAME, Deceased.

Application by MONTGOMERY WADDELL, as One of the Executors, etc., of Said Decedent, to Have Fixed and Determined the Compensation of ESSELSTYN & HAUGHWOUT, as Attorneys, and JULIUS HENRY COHEN, as Special Counsel, for the Executors of Said Will.

(Consolidated Proceedings.)

EMLEN P. FRAME and Another, Appellants, Respondents; CENTRAL HANOVER BANK AND TRUST COMPANY and Another, as Executors, etc., Appellants, Respondents; JOHN MASON, JR., and Others, Appellants, Respondents; DOROTHY FRAME STERLING and Another, Appellants, Respondents.

First Department, December 27, 1935.

* Modfg. and affg. 152 Misc. 475.

*Harold R. Medina* of counsel [*Herbert P. Queal, John A. V. Murphy* and *John W. Jordan* with him on the brief; *Herbert P. Queal*, attorney], for the appellants Bertha F. Mason and Emlen P. Frame.

*J. Ard Haughwout* of counsel [*Everett J. Esselstyn, Julius Henry Cohen* and *Burton A. Zorn* with him on the brief; *Esselstyn & Haughwout,* attorneys], for the appellants (executors).

*Nathan F. George* of counsel [*Thomas B. Fenlon* with him on the brief; *Emmet, Marvin & Martin,* individually and as attorneys, and *Wickes & Neilson,* individually and as attorneys], for John Mason, Jr., Marguerite P. Batson and Caroline M. West, and Pemberton Frame and Dorothy Frame Sterling, appellants.

MARTIN, P. J. By this appeal the decree of the Surrogate's Court is attacked on several grounds. We are asked to review that court's determination of the issues growing out of a proceeding consolidating (1) a compulsory accounting by the executors of the estate of Caroline W. Frame; (2) a voluntary accounting by the said executors; and (3) a proceeding begun by Montgomery Waddell, one of the executors, to fix and determine under section 231-a of the Surrogate's Court Act the counsel fee to be paid for services rendered to the estate.

The surrogate surcharged the executors with the sum of $57,297.92 by reason of the unlawful exercise of certain stock rights and, in addition, the sum of $4,000, by reason of overpayments of attorneys' fees. The executors appeal mainly from so much of the decree as surcharges them in any amount, directs payment of interest and awards costs. The other appellants appeal principally from the limitation of the surcharges.

Caroline W. Frame died May 24, 1925, leaving her surviving a daughter, Bertha W. Mason; a son, Emlen P. Frame, and five grandchildren. She left a last will and testament dated January 21, 1915, and a codicil dated February 1, 1923, under which she left to each of her two children the sum of $1,000 only, and five bequests of $50,000 each in trust for each of her five grandchildren, the income to be paid to them until they reached certain prescribed ages (thirty years in two instances, and thirty-five years in the other three). With the exception of a few other small bequests, she gave the residue of her estate to Fred Weaverson and Montgomery Waddell, who were also named as executors. Neither of these two individuals was related to her. Weaverson predeceased Mrs. Frame.

When the will and codicil were offered for probate, Emlen P. Frame and Bertha W. Mason (the son and daughter of the decedent) instituted a contest. Pending the determination of the contest, the Central Union Trust Company (now Central Hanover Bank and Trust Company) was appointed temporary administrator. On August 25, 1925, an agreement was entered into under which the

contest was withdrawn. The contestants consented that the will and codicil be admitted to probate; Mr. Waddell relinquished all claims theretofore made by him to the entire residuary estate, and it was provided that one-half the residuary estate should be paid to Mr. Waddell and the other half should be divided between Emlen P. Frame and Bertha W. Mason (the son and daughter of the decedent). The interests of the grandchildren under the will and codicil were preserved intact and disposition was made of conflicting claims relating to trusts in the will of Samuel Willets, the grandfather of the decedent. Under a separate agreement Mr. Waddell agreed to pay $2,400 to each of the five grandchildren out of his interest in the residuary estate.

The will and codicil were admitted to probate on October 30, 1925, and letters testamentary thereupon were issued to Central Union Trust Company (now Central Hanover Bank and Trust Company) and Montgomery Waddell, executors named therein. On November 13, 1925, the temporary administrator transferred to the executors all property of the estate in its hands. The property so transferred had an inventory value as of the date of the decedent's death of $502,764.27. In December, 1925, the executors received an additional $22,129.25 from the estate of Samuel Willets, deceased, so that the value of the property received by the executors of the estate of Caroline W. Frame was $524,893.52. The executors received securities worth $466,191.25, all of which were common stock. In addition there were Liberty bonds of the face value of $10,000. In the year 1929 the estate had reached a value of approximately $1,250,000. The account submitted by the executors in 1933 shows a loss of $182,373.08 on the original value of the securities acquired by them.

The primary duty of the executors was to reduce the estate to cash. All the money legacies were specifically payable in cash, and where a trust was to be set up the principal was to be paid over by the executors to the trustees in cash.

The will of the decedent contains no authorization to her executors and trustees to retain securities in which the estate was invested at the time of her death. The only provision in the will with reference to the nature of investments to be made by the executors and trustees is that contained in article fourteenth, which reads as follows: " I hereby authorize and empower my said executors and trustees, their survivor, successor and successors, in order to provide for the trust funds hereinabove mentioned, to purchase and invest in such securities as may at such time or times be legal investments for trustees under the laws of the State of New York or for the funds of savings banks in said State."

Before the will and codicil had been admitted to probate three of the grandchildren had attained the designated age and had become entitled to the principal of the trust fund provided for in the will for each; the fourth became entitled to his share upon reaching the designated age on September 13, 1926, and the fifth reached the designated age on October 8, 1928, and then became entitled to her share. It may be said, therefore, that the need for setting up a trust actually developed only in one instance, but in fact it was not done.

Without going into detail, the documentary evidence in the record before us dispels any doubt as to actual knowledge on the part of the executors that they were charged with the duty of disposing of the non-legal assets and, if the need arose, investing the funds of the estate in such securities as were legal for executors and trustees. They never discharged this duty and they now offer as an explanation of their failure to do so, *first*, the pendency of what is referred to as the Bertha Mason proceeding and, *second*, the acquiescence of those interested in the estate.

With reference to the Bertha Mason litigation, the record shows that some months after the settlement agreement of August 25, 1925, Bertha Mason (the daughter of the decedent) acquired information which led her to believe that her mother's estate had been much larger than was accounted for in the schedule annexed to the agreement and she made formal demand on the trust company, as executor, to institute discovery proceedings but the trust company refused to commence such proceedings. On May 6, 1926, she presented a petition to the surrogate praying that the settlement agreement be set aside on the ground of fraud and misrepresentation as to the true assets of the estate. Answers were filed and the proceeding was referred to Hon. Vernon M. Davis as referee. After hearings, the referee filed his report on February 4, 1929, and the same was confirmed by the surrogate on September 11, 1929. The litigation was not finally terminated until the Court of Appeals denied leave to appeal thereto on March 15, 1932. The surrogate has held that this litigation excused the executors for retaining the non-legal securities. As we view the situation, the mere pendency of the litigation did not justify the failure of the executors to discharge their duty. No stay was obtained and there was nothing to prevent the executors from immediately converting the securities. They felt no restraint so far as the otherwise active administration of the estate was involved, which began almost immediately upon the receipt of the assets of the estate. Administration expenses were paid as early as November 27, 1925. By the end of May, 1926, the funeral

expenses had been paid by the executors, together with most of the decedent's debts and the sum of $7,500 on account of disbursements to the executors' attorneys and, in addition, the bulk of the Federal estate tax. In May, 1926, the executors invested $35,000 in a participation in a bond and mortgage on premises 54 Wall street, New York, and within eighteen days thereafter the executors sold a $10,000 share of that participation. In November, 1926, United States Liberty bonds of the par value of $9,000 were sold by the executors. In 1929 an alleged deficiency on Federal estate taxes was paid, and the first sale of a common stock in the estate took place in 1931. Meanwhile, the executors were actively administering the estate, buying and selling securities and exercising stock rights. The executors concede that during all this period they were full fledged executors, with ample power to sell the common stocks, and that they had power to give good title to the securities in the estate. In other words, they were in complete control and were not interfered with in any manner whatsoever. They possessed all the powers and authority incidental to their position and are chargeable with the proper discharge of all duties and obligations.

The claim of acquiescence of those interested in the estate is unfounded. The grandchildren had the right to assume that the executors were acting legally, their legacies were payable in cash and they would not have gained anything in the event of advance in market prices of the securities held, but would stand to lose if the securities decreased in value before the accounting and distribution. In November, 1926, the grandchildren moved to compel payment of the legacies, which motion was denied because of the pendency of the Mason litigation. Nothing in the memorandum of the surrogate denying the motion may be construed as justifying retention of non-legal securities for the benefit of the grandchildren. Their failure to appeal from the order of the surrogate denying their motion may not be construed as acquiescence in the retention of the non-legal securities, for there is no proof that they had any knowledge of the character of the securities held. The record shows that Mr. Mortion, the vice-president of the corporate executor, made an affidavit in April, 1929, showing the value of the estate, which affidavit was filed in the surrogate's office, but in this affidavit the securities are not listed, the total value only is given. This affidavit was never served on any of the grandchildren and it is doubtful that their attorney had any knowledge of it, but even if he had knowledge, there is nothing in the affidavit which would give him notice of the character of the securities. It may reasonably be said that while the estate was being held by the executors

they gave little thought to the wishes of the grandchildren. Every one took it for granted that there would be more than sufficient to pay the specific legacies for the grandchildren and no real consideration was given to them so far as observation of legal requirements with reference to the investments was concerned. The situation with reference to Mrs. Mason and the testatrix's son, Mr. Frame, is somewhat different, for the executors maintain that they and their attorney knew exactly what common stocks were in the estate. The record shows that a detailed list of the stocks was attached to the settlement agreement of August 25, 1925, and that an itemized list had been given to Mr. Queal, the attorney for Mrs. Mason and Mr. Frame, on August 4, 1925. In November, 1929, he requested a list of the estate securities and this list was sent to him on November 11, 1929. There is nothing in the record to indicate that he had any knowledge during the period from 1925 to 1929 that non-legal securities listed in 1925 were still being retained, but the executors say that the 1929 list was sufficient to charge him with knowledge that the original stocks were still being held. Even if this list was sufficient to charge him with knowledge that the original stocks were being held, there was no duty on his part to then protest against the further retention. In *Matter of Pinney* (156 Misc. 844, 852) it was said: " There would be great danger of abuse if any general principle were established that a beneficiary might not communicate with the representative of an estate respecting the administration of it except on the hazard of being charged with having assented to any course of conduct which the fiduciary thereafter chose to follow. * * * Such inquiries expose the beneficiary to no liability whatever. They do not involve the beneficiary in the estate administration and this is so even if there be an expression of viewpoint by the beneficiary. It is only where there is an absolute assumption by the beneficiary of the fiduciary's functions, under conditions which on general legal principles impose responsibility for the result, that a fiduciary should be permitted to defend the failures of his administration by charging them to the beneficiary. Any other administrative policy would be sure to result in grave harm. A lowering of the bars to this type of defense would undoubtedly result in escape from liability by unfaithful fiduciaries. The charge of interposition by the beneficiary is easily made. There is usually at least a shadow of basis for the statement that the beneficiary did seek information and did express an opinion about what should be done. The court should not aid escape from responsibility by reason of an entirely normal exhibition of interest by one whose property rights are under administration."

In *City Bank Farmers Trust Co.* v. *Smith* (263 N. Y. 292) the Court of Appeals said: " The manner in which a trustee shall exercise his function rests ordinarily within his discretion. If he exceeds his powers, acts negligently or abuses his discretion, a beneficiary injured thereby may have redress, but a beneficiary has no power to control the action of the trustee. Consent by a beneficiary in advance may bar claim for redress, on the theory of *volenti non fit injuria*, but consent cannot enlarge nor objection limit the powers of the trustee."

Had the clients of Mr. Queal requested the executors to dispose of the non-legal securities, the record supports the conclusion that such request would have been ignored. These parties were acridly averse to one another, the attorneys for the executors never trusted Mr. Queal and were constantly on guard lest he trick them. It was felt he would " object to anything " and on one occasion he was refused a list of the assets. All of this negatives the idea that the executors were in any way influenced by the actions of Mrs. Mason or Mr. Frame.

In 1932, after the surrogate directed that the specific legacies be paid, there was correspondence between Mr. Queal and the executors in which Mr. Queal urged against the dumping of stocks at the then low figures. The attorneys for the individual executors said in a letter under date of April 14, 1932: " During all these years you yourself have kept in touch with the estate, you have been furnished with statements of the assets when you requested them and when the securities were high in price, you never requested or suggested that they should be sold." Mr. Queal's reply to this is not a denial in so many words, but the general tenor of his reply may be looked upon as a protest against the conduct of the management of the estate. In any event, his suggestion was ignored and this attitude on the part of the executors is indicative of the attitude assumed during the entire administration of the estate.

No cases have been cited by the executors which go so far as to hold that mere silence of a beneficiary is sufficient to excuse dereliction of duty on the part of an executor or trustee. The executors place great emphasis on the case of *Matter of Niles* (113 N. Y. 547), but the facts in that case differentiate it from the case at bar. There the beneficiary of the trust was at the same time a coadministrator chargeable with knowledge as such administrator of what was being done; furthermore, there was there involved an active trust. In some of the cases from which the executors quote, direct requests were made by the beneficiaries that non-legal investments be held, and in other cases there was more than mere silence.

There is no duty on the part of beneficiaries to demand that executors dispose of non-legal securities. Executors are chargeable with knowledge of their duty in that respect, and the executors here concede knowledge of the law.

The following findings of the referee appointed to take the account herein are of the utmost significance:

" 66. It was the desire of Montgomery Waddell, the individual executor, that the stocks in the estate should not be sold. Said Montgomery Waddell personally owned shares in many of the companies whose shares were owned by the estate of Caroline W. Frame, deceased. The desire of Montgomery Waddell that the said stock in the estate of Caroline W. Frame should not be sold continued during the years 1927 to 1932 inclusive.

" 67. The corporate executor acquiesced in the desire of Montgomery Waddell that the stocks be not sold.

" 68. The co-executor, Montgomery Waddell, had a personal interest in the eventual outcome of the estate. It was the judgment and desire of Montgomery Waddell, as a result of the fact that he was personally interested as a residuary legatee in the estate, that the securities be held as they were held."

While it is true that Mr. Queal's clients would benefit by an extended rise in the value of the securities, the entire record makes it clear that enhancement in value of their interest in the estate was not the motive of either of the executors. The particular findings quoted above make it clear that the individual executor allowed his interest in the residuary estate to predominate over his duty as an executor. It is reasonable to assume that had any one other than Mr. Waddell been the coexecutor, the corporate executor would have seen to it that the non-legal securities would have been disposed of promptly. Corporate executors and trustees should not act as such unless they intend to give proper attention to the duties required to properly administer an estate. It is their duty to protect those whose interests are intrusted to their care. This is especially true when they are confronted with a situation where an individual coexecutor or trustee has conflicting interests or interests adverse to the beneficiaries or at least has a purely personal motive in permitting the estate to remain for several years without being liquidated. The duties of a corporate trustee go beyond the mere taking of commissions for acting as such, and acquiescing in the desires of cotrustees whose interests are adverse to the beneficiaries. Such conduct inevitably invokes condemnation.

As has been said, the primary duty of the executors was to reduce the estate to cash for the purpose of distribution. The principal could have been preserved by selling the securities and depositing

the fund with the trust company under section 188 of the Banking Law. The executors urge, however, that it would have been a breach of their duty to deprive the estate of the income which was being received. When the executors urge the desire for income they bring their good faith into question, for, during part of the period when these securities were retained, the yield thereon was less than the interest being paid on bank balances. However, when they undertook to see that the estate was income producing, they did so with the knowledge that the will of the decedent did not authorize retention of the securities coming into their hands and that the securities were not of the character in which trustees could legally invest. For income purposes in this estate, we see no distinction between retaining the securities received and investing the funds of the estate. In *Villard* v. *Villard* (219 N. Y. 482) it was said: " If an executor disregards the provisions of the will or a rule of law relating to investments, he takes the risk of any loss that may result, without the right to any profit that he may make by reason of such investment (*Holden* v. *N. Y. & Erie Bank*, 72 N. Y. 286; *Adair* v. *Brimmer*, 74 N. Y. 539)." The executors apparently view the objection to the holding of the securities in this estate, to wit, that they were not on the New York legal list, as narrow and technical. Observance of the limitation rule would have protected the executors from the attack developed in this litigation.

Concluding, as we do, that in retaining the majority of these securities for more than six years the executors were derelict in the discharge of their duty, the question arises as to when these securities should have been sold. The authorities are uniform in holding that executors, unless expressly authorized to retain the same, should dispose of non-legal securities within a reasonable time and that what constitutes a reasonable time will vary according to the circumstances. Generally speaking, the maximum is eighteen months, and we hold that the executors in this estate should have liquidated within that period. All the securities were " high grade." No stock was held in such number of shares as would make it difficult to liquidate. The executors received the securities at a time when the country was enjoying general prosperity and there was a ready market for the type of securities held. When the executors qualified the market value of the securities was $536,522.50, as compared with the inventory value of $466,191.25. Shortly after the executors commenced to administer the estate there was a slight recession in the market, so that six months after their qualification the market value of the securities had receded to $500,212.50. There then commenced a period of rising prices. Eighteen months after qualification of the executors the securities had a market value of

$584,713.25. The rise continued and reached its peak in September, 1929, when the securities had a market value of $1,117,943.25. Then followed what is commonly referred to as the " crash " in the market and prices dropped, so that when the executors finally disposed of the securities in 1931 and 1932 they sustained a loss of $182,373.08. Except for a few minor items, this loss represents the difference between the inventory value and the prices received by the executors when they finally sold. The beneficiaries maintain that the executors should be surcharged not only with the loss they show, but with the profit they would have realized had the estate been disposed of within eighteen months. Had the executors disposed of the securities within the first six months of their administration, they would have shown a loss compared with the market value at the time they qualified. Considering the rising market, it is practically impossible to say exactly on what day the executors should have disposed of the securities. However, it is unlikely that any one would have complained if the estate had been liquidated within a reasonable time at the inventory value. We are of the opinion, therefore, that the executors should be surcharged only with the loss sustained by the estate representing the difference between the inventory value and the prices actually received by the executors when they eventually sold. This renders it unnecessary to consider the question of the power of the executors to exercise stock rights.

Until the estate was distributed, those entitled to the income were the executors. The requirements of subdivision 7 of section 188 of the Banking Law were complied with and the executors are not to be surcharged, as urged by the other appellants, for alleged failure to comply with this provision of statute.

The executors credited themselves with the payment of $60,000 for attorneys' and counsel fees. The referee found that the reasonable value to the estate of the services rendered was $56,000 and the surrogate approved that finding as the reasonable value and surcharged the executors $4,000. Of the $56,000 allowed for attorneys' and counsel fees, the referee found that the reasonable value to the estate of the services rendered by the attorneys and counsel in the Bertha F. Mason proceeding was $35,000. Parenthetically, prior to the accounting the executors sought to have allowed for attorneys' fees for services up to March, 1932, the sum of $200,000 and the surrogate allowed $60,000, and compelled the return of $40,000, the sum of $100,000 having been paid for legal services. Upon appeal this court sent the matter back because there was not before it sufficient evidence to come to a conclusion as to the value of the services rendered to the estate, as distinguished

from those rendered for the benefit of Montgomery Waddell. (*Matter of Frame [Waddell]*, 238 App. Div. 811.) As we now view the situation, the services rendered in the Mason litigation were solely for the benefit of Montgomery Waddell individually and the estate was not properly involved in that litigation. In her petition to the surrogate Bertha F. Mason asked for the following relief:

" a. To set aside the compromise agreement of August 25, 1925, insofar as it affected her interests in the Frame estate.

" b. To have stricken from the records of the court and declared of no binding force and effect her withdrawal of objections and consent to the probate of Mrs. Frame's will.

" c. To set aside the general releases which she had executed to Montgomery Waddell and Central Union Trust Company as executors of the Frame estate, and the estate of Caroline W. Frame, and to Central Union Trust Company as temporary administrator, and to Mr. Waddell.

" d. For a restoration of Mrs. Mason ' to the full standing and protection of this Court as fully and to the same effect as if said agreement of August 25, 1925, said release and said withdrawal and consent had never been executed and delivered.'

" e. For an oral examination of Mr. Waddell in order to ascertain the true and correct list of the properties and assets of the estate."

When the hearings were opened before the referee counsel for Mrs. Mason took the position that there was no intention whatever of attacking the specific legacies to the grandchildren and that the position of Mrs. Mason was they were attempting to set aside the three agreements which had been signed by her, the first, the compromise agreement dated August 25, 1925; the second, the general release, and the third, for a withdrawal of the objections to probate and a consent to the probate of the will, on the ground that they had been obtained by fraud. Mrs. Mason's counsel said: " Whether or not afterwards we shall take up the question of contesting the will — that will be a future proceeding, if any."

Neither of the executors had been a party to the settlement agreement. The estate was not a party to the settlement agreement and was not even represented. On the hearings before the referee the corporate executor retained separate counsel at considerable expense to the estate, and throughout the pendency of the Mason proceeding counsel for the corporate executor in no way co-operated with counsel for Mr. Waddell.

A consideration of the relationship existing between the testatrix and Mr. Waddell and the benefits that he had derived from such relationship, and the influence of that relationship upon the litiga-

tion between Mrs. Mason and Mr. Waddell lead to the conclusion that that litigation was directed against Mr. Waddell personally and the estate was only incidentally involved. Should Mrs. Mason succeed, the fruits of his long association ·with the testatrix were in jeopardy, he had much more to lose than his residuary interest under the will and he was very vigorous in the defense of Mrs. Mason's attempt to upset the settlement agreement. We have no doubt that the services in this litigation, for which the $35,000 has been allowed, were for his personal benefit and not for the benefit of the estate. On this appeal Mr. Waddell's attorneys take the position that Mr. Waddell won a complete victory in that litigation and that he was completely vindicated. There is not the slightest suggestion that Mr. Waddell, the executor, and the estate triumphed, thus making it clear that the interest of the estate was secondary. The estate's interest was protected by the counsel retained by the corporate executor, for which services compensation has been allowed. The executors will, therefore, be surcharged with the further sum of $35,000 paid for attorneys' and counsel fee.

It is not customary to allow compensation to executors who have been derelict in the discharge of their duties. (*Matter of Welling*, 51 App. Div. 355; *Matter of Junkersfeld*, 244 id. 260.) The executors, therefore, will be surcharged with the amount of commissions with which they have credited themselves.

The claim of the executors that the decree appealed from is incorrect in so far as it awards interest on the amount found due to the grandchildren or the representatives of the grandchildren is without merit. This direction contained in the decree may be looked upon as surplusage. Without a specific provision for the payment of interest, the amount awarded would carry with it interest down to the date of collection.

The decree appealed from should be modified in accordance with this opinion, and as so modified affirmed, with costs payable out of the estate to the appellants other than the executors.

MERRELL, McAVOY, O'MALLEY and UNTERMYER, JJ., concur.

Decree modified in accordance with opinion, and as so modified affirmed, with costs payable out of the estate to the appellants other than the executors. Settle order on notice.