In the Matter of the Judicial Settlement of the Intermediate Account of Proceedings of NEW ROCHELLE TRUST COMPANY, as Substituted Trustee for FLORENCE YOUNG (Now McKEAGE), under the Last Will and Testament of CHARLES HENRY YOUNG, Deceased.*

FLORENCE YOUNG McKEAGE and MARGARET YOUNG, Appellants; NEW ROCHELLE TRUST COMPANY, as Substituted Trustee, etc., of CHARLES HENRY YOUNG, Deceased, Respondent.

In the Matter of the Judicial Settlement of the Intermediate Account of Proceedings of NEW ROCHELLE TRUST COMPANY, as Substituted Trustee for MARGARET YOUNG, under the Last Will and Testament of CHARLES HENRY YOUNG, Deceased.

MARGARET YOUNG and FLORENCE YOUNG McKEAGE, Appellants; NEW ROCHELLE TRUST COMPANY, as Substituted Trustee, etc., of CHARLES HENRY YOUNG, Deceased, Respondent.

Second Department, January 22, 1937.

* Revg. 159 Misc. 611.

*Frederick C. McLaughlin* [*Ralph A. Bullock* with him on the brief], for the appellants.

*Albert Ritchie* [*Frederick H. Seacord, Jr.*, with him on the brief], for the respondent.

DAVIS, J. On this accounting of a trustee of a trust divided into two equal shares, there has been a judicial settlement over the objections of the beneficiaries, resulting in separate decrees. The claims of negligence and lack of fidelity on the part of the trustee have been dismissed.

It is necessary to give a somewhat detailed history of the trusts and the trusteeship to furnish the basis of the legal conclusions to be drawn therefrom. The trusts were created by the will of Charles Henry Young,. admitted to probate on May 21, 1918. The two-

then infant daughters were the beneficiaries. The trustees were the wife of the testator (and mother of the beneficiaries) and Zeger W. Van Zelm, described as the friend of the testator.

The trust provisions are as follows: " (b) The remaining one-half of such residuary estate I give and bequeath to the trustees under this Will hereinafter named, or the survivor of them and their successors, in trust nevertheless, and I direct my trustees to divide the same into two equal shares, and one of such shares I give and bequeath to my daughter Florence Young, and the other share thereof I give and bequeath to my daughter Margaret Young."

There were provisions for payments from income for support, education and maintenance of the children during the period of minority; and thereafter the income was to be paid to them until each respectively became twenty-five years of age. When each daughter reached that age the trust ceased as to her, and the share plus any accumulations was to be paid to such beneficiary. There were provisions (not important here) for disposition of the remainder if either should die before reaching the age of twenty-five. It has been convenient for the trustee to interpret the will as constituting two trust estates.

Evidently the duties of the individual trustees were faithfully discharged during the period from 1918 to 1930. About September 23, 1930, for some reason not explained, the individual trustees resigned and New Rochelle Trust Company (hereinafter called the bank) was substituted. The trust estate was turned over to the substituted trustee about October 6, 1930. Each estate at that time had an inventory value of over $18,300. Very largely the trust property was then invested in Fourth Liberty Loan four and one-quarter per cent bonds and New York city four and one-half per cent corporate stock. These were inventoried at their cost several years before, but at this time they had substantially increased in value. These securities were sold almost immediately by the bank, and there resulted an apparent profit in each estate of more than $1,200. This, of course, was no actual profit, but it simply showed the accretion in value during the term of the former trustees. At this time Florence was about twenty-two and Margaret about eighteen years of age.

The sound securities having been reduced to cash, the trustee purchased two mortgages producing a higher income, which were divided between the separate estates. One, of $22,000, was called the Levine mortgage. The other, called the Titus mortgage, was for $17,000. In July, 1931, the Titus property was sold, and the new owner gave notice that he wanted to pay the mortgage either

in whole or in part. He did pay $4,000 on the mortgage, and the bank took over this mortgage to its own account, and from its portfolio substituted in the trust estate a mortgage known as the Muir mortgage, of $17,000. The entire controversy centers on this mortgage. The trustee, in making the change of investment, legally accepted full responsibility for its act. (*City Bank Farmers Trust Co.* v. *Smith*, 263 N. Y. 292.)

The Muir mortgage came into the hands of the bank in this manner: One R. Douglas Muir had, beginning in May, 1927, borrowed money from the bank on his demand notes. These five notes, given within a period of two years, were not indorsed, nor had Muir furnished any financial statement to the bank concerning his property or earnings. The notes were secured only by 380 shares of the common stock of United Founders Corporation and twenty-seven common shares of the American Founders Corporation. During the period of about five years nothing had been paid on the principal of these demand notes, although interest had been paid from time to time. The collateral fell somewhat rapidly in value after 1929, so that it was insufficient to cover the indebtedness. Beginning in June, 1930, efforts were made by the subordinate officer who had made the loan to obtain further collateral or payments on the notes. Muir ignored these demands. On February 19, 1931, the amount of principal and interest due was $4,261.77, while the value of the collateral did not exceed $3,000. Subsequently, as is commonly known, it became worthless.

On November 10, 1930, the wife of Muir made an application to the bank for a loan of $20,000 secured by a mortgage on her home. Whether this act was on her own motion or was inspired by the bank does not appear. The application showed that the assessed value of the property was $18,740. One of the directors and his son made an appraisal of this property on November eighteenth and reported to the appraisal committee, of which the appraising director was a member, that he valued the property at $33,500. No other investigation or inquiry was made by any officer or employee of the bank. He and the other two members (the president and attorney) then accepted the appraisal, and approved the loan at $17,000. At this time there was an undischarged purchase-money mortgage on the property for $5,500 which it was claimed had been paid. It took about three months' effort on the part of the attorney for the bank to get this mortgage discharged. Then the mortgage of $17,000 was executed.

There were back taxes to be paid, as well as the appraiser's fee and the attorney's fees for getting the former mortgage discharged and handling the transaction, so that only about $16,000 was

payable to the mortgagor. Then the amount due on the husband's notes was deducted; and the balance paid to Mrs. Muir on this $17,000 mortgage was less than $12,000. The transaction was closed on February 19, 1931.

This Muir mortgage was the one substituted for the Titus mortgage on September 8, 1931. The way it came to be so substituted was that an assistant trust officer looked through the bank's portfolio and found this mortgage of the same face amount as the Titus mortgage. There was no new appraisal of its value and no inquiry made concerning either the property or the financial condition of the mortgagor; in fact, this officer was not acquainted with either Mrs. Muir or her husband and had not seen the property. The matter was not called to the attention of the trust officer or any other officer of the bank. In this casual way the Muir mortgage became a part of the trust estate, with one of the beneficiaries still an infant. There had not been even an assignment of the mortgage to the trust estate.

It subsequently developed that Muir was out of employment during this period; that Mrs. Muir had no independent vocation or means except a small " household account " in the bank; and that there was no visible means of paying interest and carrying charges of about $1,500 yearly on the property, except as it might be paid out of what was left of the money loaned on the mortgage. From the time the mortgage came into the trust estate the interest was not paid promptly, which fact was in itself a warning to a vigilant trustee; and in about two years payments entirely ceased. Taxes on the property in an undetermined amount remained unpaid. Mortgages and real property began decreasing in value during the latter half of 1931.

The property securing the mortgage was a residence well located. It was a large old-fashioned house on ample grounds, having been built in 1907. It had not been kept modern in respect to heating, electrical fixtures, plumbing and baths, and in other ways. It was not entirely in a good state of repair and had not been repainted for some years. It was not of a type or condition readily salable. On the hearing it was apparent that the original appraisal was little more than formal, by one interested in the appraisal fee. The committee who approved the appraisal knew little or nothing about the property. The credible testimony on the hearing fixed the value of this property in 1931 at about $19,000 or $20,000. On that basis it was not a legal investment for either the bank or the estate. It had been made apparently legal only by a high appraisal. It is now worth much less than in 1931. To realize anything for the trust estate it was necessary to foreclose and sell. That was

not the policy adopted, for undoubtedly a sale would have shown a substantial deficiency.

From the foregoing state of facts the learned surrogate found that there was no lack of fidelity and no negligence on the part of the trustee. We reach a different conclusion.

A principle firmly fixed in equity is that a trustee may not deal with himself. The simple fact that he did is enough to indicate disloyalty to the estate, calling for the strongest justification if the investment proved to be an unfortunate one. Ordinarily there will be no inquiry as to whether the transaction was fair or unfair, but it will be set aside when the relation is disclosed. (*Munson* v. *S., G. & C. R. R. Co.*, 103 N. Y. 58; *Matter of L. I. L. & T. Co. [In re Garretson]*, 92 App. Div. 1; affd., 179 N. Y. 520; *Pyle* v. *Pyle*, 137 App. Div. 568.) In making investments more latitude in certain respects has been given to a corporate trustee than to an individual trustee by section 188, subdivision 7, of the Banking Law, although such a trustee is forbidden to purchase securities of itself. (See, also, *Matter of Union Trust Co. [Hoffman Estate]*, 219 N. Y. 514.) In making investments in mortgages and dividing the participation thereof between different trust estates, " it was assumed that a trustee would not deal with himself in making such investments." (*Matter of Flint*, 240 App. Div. 217, 221; affd., 266 N. Y. 607; *Matter of Peck*, 152 Misc. 315.) A trustee may not profit by purchasing a mortgage for the trust estate, whether it be by receiving a commission or by making it a means of receiving payment on a personal debt. The statutes relating to investments by corporate trustees " leave untouched the obligation of a trustee to act with prudence, foresight and vigilance and without negligence in making investments." (*Matter of Flint, supra*, p. 225.) There must at least be recognition of the common rules of fidelity expected of one acting in a fiduciary capacity — something higher than " the morals of the market place." (*Meinhard* v. *Salmon*, 249 N. Y. 458, 464; *Durant* v. *Crowley*, 197 App. Div. 540; affd., 234 N. Y. 581; *Matter of Frame*, 245 App. Div. 675.)

Furthermore, it is the duty of a trustee to keep funds in a state of security, productive of interest and subject to future recall. (*Matter of Flint, supra*, p. 226.) Here the trustee made no investigation of the soundness of the security or the financial responsibility of the person obligated on the bond. While it was holding this security as a part of the trust estate, the trustee made no inquiry on the subject as to whether taxes were paid or unpaid. It knew that interest was not being paid promptly on the due date after the mortgage had been taken from the bank's portfolio and placed in the trust estate with no notice either to the beneficiaries or the

trust officer. The whole matter was handled by inattentive and neglectful subordinates. These facts and these familiar principles lead us to the conclusion that there was negligence and lack of fidelity sufficient to hold the trustee liable to the beneficiaries for any loss suffered by the estate.

It is not to the credit of the trustee that the question of ratification by the beneficiaries of the acts of the bank was raised on the hearing before the surrogate and repeated here. We discuss the subject briefly and with reluctance. We think it is sufficient to say that Florence reached the age when she became entitled to her principal share. Nothing was done by the trustee; and it appears that about October, 1934, for the first time, the beneficiaries became aware that the Muir mortgage was a part of the trust estate and was producing no income. They made protest to the trust officer, who apparently became informed for the first time concerning this investment. Then began correspondence and negotiations between the trust officer and the beneficiaries, with representations concerning the security of the mortgage and the value of the property. A demand was made for a quick decision, to the end that these inexperienced young women, without legal advice, were induced to take title to the Muir property in satisfaction of that part of the trust estate, with the trustee still holding the mortgage in its files undischarged. A considerable amount of jugglery was necessary whereby the beneficiaries were compelled to pay the interest on the mortgage and the taxes on the property, aggregating about $1,700, before they got title. This was characterized by a bank officer as " a wash transaction." The books and accounts of the trustee then appeared to be in a satisfactory state on an inspection that might be made by any inquirer.

That state of facts does not constitute ratification. There can be no ratification where a beneficiary is not fully apprised of the facts to be ratified, and is left without knowledge of the acts to be confirmed or of her rights under the law applicable, and how these acts would be dealt with by a court of equity. (*Adair* v. *Brimmer*, 74 N. Y. 539, 554; *Smith* v. *Howlett*, 29 App. Div. 182; *Babcock* v. *Warner Bros. Theatres, Inc.*, 240 id. 466, 470; *Matter of Junkersfeld*, 244 id. 260, 266; *Matter of Frame, supra.*) The defense of ratification here must fail in the face of facts about which there is little dispute.

For the reasons stated, the decrees should be reversed on the law and the facts, with costs to appellants, payable by the trustee personally, and the matter remitted to the Surrogate's Court of Westchester county to grant rescission of the deed, if the appellants so elect, and to surcharge the trustee's account with the amount of the Muir mortgage, interest, taxes, and the expenses heretofore

charged to the estate; or, if the appellants do not elect to rescind, to determine the value of the property and surcharge the account of the trustee with the deficiency thereby arising, and to determine, in the exercise of discretion, whether commissions should be allowed, and to make proper allowances for costs and expenses.

LAZANSKY, P. J., HAGARTY, CARSWELL and ADEL, JJ., concur.

Decrees of the Surrogate's Court of Westchester county reversed on the law and the facts, with costs to appellants, payable by the trustee personally, and the matter remitted to the Surrogate's Court to grant rescission of the deed, if appellants so elect, and to surcharge the trustee's account with the amount of the Muir mortgage, interest, taxes and the expenses heretofore charged to the estate; or, if appellants do not elect to rescind, to determine the value of the property and surcharge the account of the trustee with the deficiency thereby arising, and to determine, in the exercise of discretion, whether commissions should be allowed and to make proper allowances for costs and expenses.