OPINION OF THE COURT
Albert J. Emanuelli, S.
THE PROCEEDING
In this proceeding for advice and direction, Bankers Trust Company (hereinafter Bankers Trust) and Gerald J. Schultz (hereinafter Schultz), two of three trustees (the third being Ronald Winston, hereinafter Ronald), of the marital trust under the Will (hereinafter the Will) of Harry Winston (hereinafter Harry), seek an order:
1. Pursuant to CPLR 2221, reconsidering that part of this court’s prior decision dated October 19, 1992 that conditionally granted Ronald’s motion for summary judgment dismissing the within petition to the extent petitioners challenged Ronald’s exercise of his power under Article Twelfth of the Will (hereinafter the Article Twelfth power) to distribute stock of Harry Winston, Inc. (hereinafter HWI) and Harry Winston, S. A. (hereinafter HWSA) to himself, to the trustees of the continuing trust for Bruce Winston and to Bruce Winston, and upon reconsideration, directing that Ronald Winston, Bruce Winston and the trustees return to the trustees of the marital trust the stock that was distributed pursuant to Ronald’s direction;
2. Authorizing the petitioners to sell all or part of the stock of HWI and HWSA or to take other appropriate action to maximize the return on trust assets; and
3. Suspending Ronald’s power under Article Twelfth of the Will with respect to the sale or other appropriate action.
The relief sought in items 2 and 3 above is presented to the court for the first time on the instant motion. Furthermore, although denominated as a motion for reconsideration, the court treats the motion as one for renewal based upon, facts that were not known or reasonably discernable at the time of the prior decision and new information in the form of corporate appraisals which have a profound impact on this litigation and require the court to revisit the issues raised on the earlier motion.
This decision is rendered after months of lengthy and in-depth settlement talks and conferences. The pleadings in this *297 matter contain a significant amount of sensitive and proprietary information concerning the management and operation of the family corporations. The parties have sought to shelter this information through a confidentiality agreement and order. However, the court cannot properly address the issues raised in this application without referring to the very aspects of the Winston enterprise which the parties seek to keep confidential. Accordingly, although the parties are bound by their confidentiality agreement, the court elects not to seal this decision.
For the reasons hereinafter set forth, the motion is granted in its entirety.
BACKGROUND
Harry Winston died in 1978 survived by his wife Edna and two sons, Ronald and Bruce. After providing nominal bequests to his sons, relatives and associates, the balance of Harry’s estate was divided roughly in half between a pecuniary trust for his wife and a residuary bequest to the Harry Winston Research Foundation (hereinafter the Foundation). The marital trust received approximately $69 million in assets consisting primarily of 90 shares of common stock of HWI with a date of distribution value of $63 million. The Foundation received 95 shares of cumulative preferred stock of HWI worth approximately $68 million.
Edna Winston died in 1986. On her death the marital trust corpus was to be split equally between Ronald and Bruce. Ronald was bequeathed his half outright while Bruce’s share is held in a continuing trust. Bruce receives the trust income annually plus a percentage of the corpus on each fifth anniversary of his mother’s death for 25 years. After 25 years the trust terminates and the remaining principal is paid to Bruce.
The trustees and Bruce enjoyed a harmonious relationship until 1990 when issues arose concerning Ronald’s management of the corporations and his use of a power under Article Twelfth of the Fourth Codicil to the Will to overrule the majority decision of the independent trustees on matters concerning the management of the family business and the administration of the yet undistributed marital trust. There ensued what has now been five years of intense, acrimonious litigation, generating a score of proceedings and millions of dollars in legal expense.
This proceeding for advice and direction was filed in response to a decision by Ronald in 1991 to direct an in-kind distribu *298 tion of the common stock of HWI and HWSA from the marital trust. Adhering to what he construed as the decedent’s testamentary plan, and over the objections of Bruce, Schultz and Bankers Trust, Ronald distributed half the stock of HWI and HWSA to himself; 40% to the continuing trust for Bruce and 10% to Bruce outright. (Bruce was theoretically entitled to a 20% principal distribution from his continuing trust by virtue of the first fifth year anniversary of his mother’s death.) The majority of the trustees had voted to retain the stock pending the settlement of their account and in turn brought this proceeding to recover the stock claiming Ronald’s action was self-motivated, an act of misconduct and an abuse of his Article Twelfth power. Furthermore, the trustees claimed the stock was needed to satisfy claims for fees and expenses and as security against multimillion dollar claims by Bruce and the estate of Edna Winston. Ronald, on the other hand, claimed the distribution was necessary to minimize the annual expense of trustees’ commissions. Trustees’ commissions had been accumulating for many years because the marital trust lacked liquidity to pay recurring administration expenses. Given the information available at the time and crediting Ronald’s representations, it appeared not only reasonable, but in the trust’s best interest that the distribution be ratified if coupled with a mechanism to guarantee that the stock would be available should it be needed to satisfy trust obligations. Accordingly, the court approved the transaction on condition that Ronald post a refunding bond which at a later court conference was changed to an escrow agreement between Ronald and the independent trustees. As noted, however, important and relevant information has now been brought to the court’s attention which in law and equity mandatés a reconsideration of the court’s earlier decision.
THE REORGINIZATION OF HWI
In 1979, the executors of Harry’s estate, acting pursuant to authority given to them under the Will, effected a reorganization of HWI to create 100 shares of cumulative preferred stock and 100 shares of common stock. Ninety-five shares of preferred stock were distributed to the Harry Winston Research Foundation in satisfaction of its residuary share and 90 shares of common stock were distributed to the marital trust in satisfaction of the marital bequest. The preferred stock was later gifted by the Foundation to the Genetic Research Trust, a Bermuda trust created and allegedly controlled by Ronald. The remain *299 ing preferred and common stock was redeemed to pay administration expenses. Under the terms of reorganization, the preferred stock is entitled to a guaranteed annual dividend of $3,500 per share or $332,500. There is no obligation to pay the preferred dividend annually, and the holder of the preferred stock cannot demand or enforce payment. Any dividend not paid is accumulated. To obtain further dividends, a like dividend (i.e., $3,500 per share), would first have to be paid to the common shares. After this dividend is paid the preferred and common shares participate pro rata in any further dividends. However, there can be no payment of dividends to the common stock so long as the preferred stock is owed annual dividends. The company has not kept current with its dividend obligations. As of August 31, 1993, the preferred shareholder was owed $2,493,750 in accrued dividends. In addition to a guaranteed annual dividend, the preferred stock is also entitled to a pro rata share of the proceeds from liquidation should HWI be dissolved. The capital stock of HWI remained constant at 185 shares until 1986 as did the equity ratio between the preferred shares and common shares. Thus, during Edna’s life, the common and preferred shares had nearly identical rights and interests in the corporation. Beyond the payment of the upfront dividends, the common shares were entitled to 49% (90/185ths) of discretionary dividends and 49% of the proceeds upon liquidation. By contrast, the preferred shares, after payment of the guaranteed dividend and a like dividend to the common shares, were entitled to 51% (95/185ths) of discretionary dividends and 51% of the proceeds from liquidation. However, beginning in 1986, the marital trust began selling common stock back to the corporation to raise cash to pay Edna’s estate tax and estate administration expenses. Altogether, 73 shares were redeemed between 1986 and 1990 leaving only 17 shares in the marital trust. The redemption of common shares had a significant impact on the equity ratio between the preferred shares and common shares. Now, with only 112 shares of capital stock outstanding, the common shares represent only 15% of the equity of the corporation (17/ 112ths). At the same time, the interest of the preferred shares has correspondingly increased from 51% to 85%.
VALUATIONS
In 1991, the trustees requested the firm of Houlihan, Lokey, Howard & Zukin (hereinafter Houlihan) to render an opinion as to the fair market value as of May 31, 1991 of (1) the 17 *300 common shares of HWI, and (2) the 396 shares of capital stock of HWSA held by the marital trust. Houlihan rendered a detailed appraisal and report which placed a value of $9 million on common shares of HWI and of $3 million on the capital stock of HWSA. As to HWI, Houlihan assumed that the highest value would be realized in an orderly liquidation of the company. Nine million dollars represented 15% of the liquidation value of the company plus a small premium to reflect the possibility of buying the preferred stock at a discount to its pro rata economic interest. The amount seemed consistent with a 1986 Morgan Stanley appraisal which valued the 90 shares of common prior to redemption at $41 million. Shortly thereafter, Ronald Winston, on behalf of the trustees, asked Houlihan to render a further opinion as to the fair market value of Bruce’s one-half interest in the stock of both companies. Houlihan thereafter appraised 81/2 shares of HWI and 198 shares of HWSA at $3.6 million and $900,000 respectively.
With this information in hand, Ronald applied to the court for permission to purchase half the stock of the companies from Bruce and the trustees for $4.5 million. The application was opposed by Bruce and as part of that proceeding, two additional appraisals were commissioned. The first by Lehman Brothers (hereinafter Lehman), on behalf of Bruce, valued the 17 shares of HWI common at $75 million, the 95 shares of HWI preferred at $5.5 million and the 396 shares of HWSA at $15 million. The second appraisal was commissioned by the court with the consent of the parties from Stanley Goodman of the business appraisal firm of Goodman, Rakover & Agiato (hereinafter Goodman). Goodman, whose ability, expertise and reputation are well known, placed a total value on the stock of both companies of $60 million. Of this, $48 million was allocated to the 17 common shares of HWI, $10 million to the preferred shares of HWI and $2 million to the capital stock of HWSA.
These latest two appraisals are significant in several respects. First and foremost, they establish a value for the common stock of HWI in a change of control sale that is at least five times higher than the best price that could be achieved through liquidation. So disparate is the value to the common shareholder in a sale as compared to a liquidation that both appraisers consider it inconceivable for the common holders to ever approve a liquidation. The second important consideration is the implication raised by the Goodman appraisal concerning the corporation’s ability to pay reasonable dividends.
*301 Bruce has complained of the corporation’s failure to declare dividends from the very inception of these proceedings. Ronald’s response has always been twofold: First, that the corporation never paid dividends to its common shareholders and it was never the decedent’s intention that this policy change. Second, that a lack of profitability has precluded the declaration of dividends. The audited financial statements for HWI from 1980 to 1990 bear this out to a degree. During this 11-year period, the corporation lost money in 7 years and showed a profit in only 4. Parenthetically, Ronald’s salary steadily increased from $248,000 in 1979 to $1,138,000 in 1990. Without considering the reasons for these losses or speculating upon the corporation’s future prospects for profitability, it is an irrefutable fact that the corporation will never pay dividends to the common stockholders that bear a reasonable relation to the value of the common stock, if at all. If the court accepts Goodman’s opinion that the common stock of HWI is worth $48 million, then in order to generate just a 3% return or about $1,500,000, HWI would have to declare an annual dividend of $10,000,000. In addition, the company would first have to pay all accrued dividends to the holder of the preferred stock. The likelihood of this happening is nil to nonexistent. This combination of facts, i.e., the unlikelihood of future dividends, coupled with the substantial rights of the preferred stock upon dissolution, caused the court-appointed appraiser to conclude that while the common stock of HWI and HWSA should bring $50 million in a change of control sale, there is no market and therefore little value for a fractional share of the stock. The true effect then of Ronald’s decision to effect a distribution of the stock is to render Bruce’s and the trustees’ share of the common stock of the corporations valueless. Conversely, Ronald’s interest in the corporation, which is derived exclusively from his salary and perquisites as president, chief executive officer and director, remains unaffected.
THE ISSUE
The threshold question then is whether Ronald is entitled absolutely to a distribution in-kind from the marital trust of 50% of the stock of HWI and HWSA as a trust remainderman. And if not, was Ronald’s decision to distribute the stock to himself and others such an abuse of discretion and breach of fiduciary duty that the court should strip him of his Article Twelfth veto power?
*302 LAW AND EQUITY
Restatement (Second) of Trusts § 347 deals with the termination of a trust involving multiple beneficiaries. The Restatement declares: "If upon the termination of the trust there are several beneficiaries among whom the trust estate is to be distributed, whether the trustee is under a duty to convey the property to the beneficiaries as tenants in common, or to divide the property and distribute it in kind, or to sell it and distribute the proceeds, depends upon the terms of the trust and in the absence of such terms upon what under all the circumstances is reasonable.”
The Restatement has recently been cited as authority by the Court of Appeals in Mercury Bay Boating Club v San Diego Yacht Club (76 NY2d 256, 270) and by the Appellate Division, Second Department, in Matter of Wood (177 AD2d 161, 166).
In determining a proper mode of distribution the court must weigh a number of relevant factors. Among these factors are: whether the trust instrument makes provision expressly or by implication, as to the mode of distribution; whether all beneficiaries agree upon a mode of distribution; whether the trust consists of fungible or nonfungible property and whether a distribution in-kind is practicable under the circumstances. (See, 4 Scott, Trusts § 347, at 563 [Fratcher 4th ed 1989].)
Normally, where there are multiple beneficiaries and some of them do not consent to a distribution in-kind, the others cannot insist on a distribution of their share in-kind unless distribution in-kind is authorized by the terms of the trust or by court order. (See, 4 Scott, Trusts § 347.4, at 573.) Here, Ronald’s decision to make an in-kind distribution of the shares of HWI and HWSA was opposed by Bruce, a coequal trust beneficiary and by the independent trustee of the continuing trust for Bruce. Bruce insisted on a sale of the stock in a change of control transaction. In light of Bruce’s and the trustees’ opposition it cannot be said that Ronald was entitled, absolutely, to an in-kind distribution.
Likewise, a fractional distribution in-kind is unwarranted where the property can be sold more advantageously as a whole as, for example, where it includes shares of stock representing a controlling interest in a corporation. (See, 4 Scott, Trusts § 347.4, at 574.) "[I]f the trustee could obtain a better price by disposing of the property as a unit, he cannot properly convey part of it to a beneficiary without the consent of the other beneficiaries, unless it is otherwise provided by the terms of the *303 trust.” (Restatement [Second] of Trusts § 347, comment g [1959].) Thus, as here, when a distribution in-kind has the effect of depriving a beneficiary of the value of his inheritance, the authority for such a distribution must be strictly scrutinized.
WILL CONSTRUCTION
Ronald contends that his father’s primary objective, as reflected in an elaborate Will and four codicils, was to provide a mechanism for the "preservation and perpetuation of the Winston family enterprise” under Ronald’s management and control, and, therefore, that the stock distribution is not only necessary to implement his father’s dominant intent but mandated by the Will. Ronald further contends that the debilitating effect of an in-kind distribution upon the value of Bruce’s half share of the trust and his corresponding inability to receive income was anticipated by the decedent as a natural consequence of his estate and business plan and should not be an overriding consideration which affects the result.
The provisions concerning the marital trust and its disposition on Edna’s death are set forth in Article Eighth of the Will as amended by the First Codicil dated June 27,1968. The clause contains the usual provisions to pay the entire net income to Edna for life and so much of the principal as may be needed for her support and welfare. The Will further gave Edna an unrestricted power to appoint the principal of the trust on her death. In default of the exercise of the power of appointment, Article Eighth (C) provides in pertinent part as follows:
"Eighth- * * * (C) * * * so much of the principal as shall then remain and shall not have been effectively appointed by [Edna] shall be divided into two (2) equal shares; and I direct my trustees to set apart:
"(1) one (1) share for my son, Ronald Winston * * *
"(2) one (1) share for my son, Bruce Winston * * *
"(D) If my son, Ronald Winston, is then living, the share set apart for him shall be distributed to him outright.
"(E) If my son, Bruce Winston, is then living, the share set apart for him shall be held in trust * * *
"(1) To pay or apply the net income, at least semi-annually, to or for the benefit of my son, Bruce Winston, until the date of his death or the trust otherwise terminates.”
Clearly there is no language in the above-quoted provisions of Harry’s Will which directs in clear and unambiguous terms *304 an in-kind distribution of stock on Edna’s death. Quite the contrary, the fiduciary powers clause of Article Thirteenth of the Will confers upon the trustees broad powers to sell, to distribute any and all property "in-kind or in cash” and vests in them broad authority to continue the Winston businesses for such periods as they determine.
Article Thirteenth of the Will provides in relevant part:
"I grant to my executors and trustees (and to any successor or substitute) with respect to any property at any time held under the provisions of this Will power to:
"A) Acquire by purchase or otherwise, and retain, temporarily or permanently, any and all kinds of realty and personalty, even though not of the character expressly approved by law as investments for fiduciaries and regardless of any rule requiring diversity of fiduciary investments, provided, however * * * that this power shall under no circumstances be construed as requiring my executors or trustees to retain property which produces no income or as relieving them of their duty to so invest estate and trust assets as to make them productive of income;
"(B) Sell or otherwise dispose of realty or personalty, publicly or privately, on such terms as to cash or credit as may be deemed advisable;
"(C) Establish trusts and divide or distribute property in-kind or in cash, or partly in each, including undivided interests, even if shares be composed differently, provided that only property which qualifies for marital deduction shall be allocated to the trust for my wife * * *
"(H) Continue and carry on or permit the continuation of any business, incorporated or unincorporated, which I may own or in which I may have any interest at the time of my death for such period as they shall determine and invest additional sums in any such business even to extent that my estate or any trust hereby created may be invested largely or entirely in any such business; act as or select other persons (including any beneficiary hereunder) to act as directors, officers or employees of any such business * * * and make such other arrangement in respect of the continued operation of any such business as they shall deem proper. ” (Emphasis added.)
Equally important is that the trustees’ broad discretionary powers continue beyond the termination of the trust and are exercisable by them until a "final distribution” of the trust assets: "All the foregoing powers shall be' in addition to the pow *305 ers granted to my executors and trustees by section 11-1.1 of the New York Estates, Powers and Trusts Law, or any other statute or rule of law or by any other provision of this Will and all such powers shall be exercisable by them until final distribution of my estate and the trusts hereby created has been completed. ” (Art Thirteenth, last full para [emphasis added].)
Other articles and paragraphs of the Will do create a mechanism for the continuation and preservation of the businesses after Harry’s death. For example, Article Second of the First Codicil grants to HWI a right of first refusal to purchase the stock of any shareholder. The Fourth Codicil designates Ronald, while acting as trustee, as arbiter of disputes among the trustees. Article Thirteenth (H) of the Will confers broad powers to the trustees to manage the business, to act as directors and officers and to invest additional estate or trust assets in the business and in general to make such other arrangements with respect to the continued operation of the business as they shall deem proper.
Clearly, Harry envisioned that the business would be continued after his death and no one contends otherwise. Nor does anyone seriously dispute that Harry intended his son Ronald to continue as an officer and director of the companies. Indeed, Ronald was employed in the business and worked with his father for many years prior to Harry’s death. The Will and four codicils also show an evolving estate and business plan in which the decedent vests greater and greater responsibility in his son Ronald. However, for Ronald to conclude from these facts that Harry intended to vest absolute control of the family enterprise in him for the balance of his career and to subordinate Bruce’s inheritance to this alleged dominant and paramount intention, even at the expense of depriving Bruce of the benefit and value of his "equal share” of the family fortune, is simply not supported by a reasonable construction and interpretation of the Will. As stated by Surrogate Wells, "[I]f decedent chose not to provide for * * * [his son], there were certainly several other direct methods of so doing, rather than employing the circuitous, convoluted method proposed by [respondent] * * * 'Certain it is that decedent did not intend to draw a meaningless, dispositive document to mock [his] beneficiaries’ ” (Matter of Patouillet, 158 Misc 2d 473, 477, citing In re Glorney’s Trust, 109 NYS2d 898, 904).
In construing the will of a decedent several canons of construction apply. First, the primary objective of the construction proceeding is to ascertain and give effect to the intent of *306 the testator (Matter of Gustafson, 74 NY2d 448). "In any construction proceeding, the primary rule is that an instrument should be interpreted to reflect the intention of the maker. This intention is not to be gleaned by focusing upon any one sentence or provision, but must be ascertained from an examination of the entire document” (Matter of Herrig, 122 Misc 2d 740, 742, citing Matter of Jones, 38 NY2d 189; Matter of Kosek, 31 NY2d 475; Matter of Flyer, 23 NY2d 579; Matter of Thall, 18 NY2d 186; Matter of Dammann, 12 NY2d 500; Matter of Larkin, 9 NY2d 88; Matter of Fabbri, 2 NY2d 236). Whenever possible, the provisions of the Will should be read as a whole with individual parts of the whole read and construed in harmonious relation to one another (10B Cox-Arenson-Medina, NY Civ Prac, SCPA 1420.30 [a], at 14-324.95). The circumstances surrounding the testator may be considered in interpreting the words used (Matter of Larkin, supra, and "[i]f the court upon reading the will in this setting discerns a dominant purpose or plan of distribution, the individual parts of the will must be read in relation to that purpose and given effect accordingly” (Matter of Fabbri, supra, at 240; see also, Roe v Vingut, 117 NY 204, 212).
Applying these principles to a reading of the Will as a whole, the court discerns the decedent’s dominant intent to be the maintenance of a fair income for his wife and children and an equal division of the value of his estate between his two sons. Words should be accorded their plain and usual meaning. Thus, a direction to pay out all the net income of a $70 million trust should not be read out of a plainly worded will and rendered meaningless by the expedient of not declaring dividends or retaining hopelessly unproductive assets. Likewise, a simple and unequivocal direction to divide the trust remainder into "two (2) equal shares” should not be satisfied by a formalistic division of property that results in two equal shares of unequal value. Furthermore, a man of Harry Winston’s sagacity and business ability could not have intended, from mere vanity, the continuation of a business with which his name and efforts had been associated for the exclusive benefit of one son at the expense of the other. There is not a single reference in his 17-page Will, or in any of the four codicils, to suggest that one family member should derive greater benefits from the estate than another. The fiduciary responsibilities conferred upon Ronald do not evince Harry’s intent to afford him special treatment, but to the contrary, impose on Ronald a special fiduciary obligation of fairness and undivided loyalty in his manage *307 ment of the family business and his dealings with family members (Meinhard v Salmon, 249 NY 458). Likewise Harry’s decision to continue Bruce’s half share of the estate in further trust should not be interpreted as diminishing Bruce’s legacy but as an expression of intent to protect and preserve the full value of Bruce’s inheritance.
Harry could have done all the things that Ronald reads into the Will and four codicils but he did not. Had Harry intended to protect Ronald’s position within the company he could have mandated an in-kind distribution of the stock. Instead he bequeathed to Ronald only a share of the trust remainder. Had Harry intended to insure Ronald’s control of the corporation he could have bequeathed Ronald a 51% interest in HWI. Instead Ronald receives only a share equal with that of his brother Bruce.
Harry’s estate and business plan is a reflection of how he ran the business and provided for the family during his lifetime. Historically, the business provided a comfortable living for the entire family. Though no dividends were ever declared the decedent insured the comfort and prosperity of his sons through salaries and corporate perquisites. To some measure, this continued after Harry’s death. Edna, who later became incapacitated, allegedly had sufficient assets of her own and did not complain of the lack of income from the trust. Bruce, on the other hand, received a modest salary and an expense account. At least until Edna’s death the business provided some measure of support to Bruce.
During Edna’s lifetime the only impediment to the declaration of dividends was the profitability of the company and the payment of accrued dividends to the preferred stock. Beyond that, the trust was entitled to receive $315,000 per year. Any additional dividends would have been shared equally with the preferred. More importantly the common stock could have been sold or the company could have been liquidated to make the trust income producing. Prior to Edna’s death, the common stock would have received 49% of the proceeds from liquidation. It may well have been Harry’s hope that his life’s work would perpetuate and that the business would continue as a source of wealth, prestige and enjoyment for his wife and children, just as it had been during his lifetime. However, a combination of events has transpired since Harry’s death, which, by design or circumstance, have so debilitated the common stock that an equitable in-kind distribution of the trust corpus is effectively precluded. These events in chronological *308 order are: (1) the decision to reorganize HWI by the creation of a class of preferred stock; (2) Ronald’s decision to gift the preferred stock from the Harry Winston Research Foundation to the Genetic Research Trust, an offshore trust in Bermuda which he controls; (3) HWI’s 15-year history of unprofitability; (4) Ronald’s failure to pay guaranteed annual dividends to the preferred stock; (5) the redemption of common stock to pay estate taxes; (6) Ronald’s failure to redeem the preferred stock; and (7) Ronald’s declared intent never to pay dividends.
DISCUSSION
The concept of creating a new class of preferred stock was a brilliant estate planning device which resulted in a tremendous estate tax savings with little or no sacrifice by the corporation or the family. In exchange for a $70 million charitable deduction, the family’s only obligation was to pay a guaranteed annual dividend on $3,500 per share (times 95 shares) and to share equally with the preferred should HWI ever be liquidated. Both these obligations were purely illusory since the corporation paid only one dividend in 15 years and there was never an intention to dissolve the business. In time however, the existence of the preferred stock became a critical ingredient in determining the value of the common stock. A pivotal event occurred in 1990 when common stock was redeemed to pay Edna’s estate taxes. Only 17 shares of common remained after redemption. More importantly, however, the equity ratio between preferred and common shifted from 51% vs. 49% prior to redemption to 85% vs. 15% after redemption. As a result, the preferred is now entitled to 85% of excess dividends and 85% of the liquidation value of the company. The impact of these events in real market terms is obvious. Simply stated, the market for a one-half share of the common stock of HWI is no more than 71/2% of the dissolution value of the company which, according to Ronald’s own appraiser, is $4.5 million. This, by contrast, is less than 20% of the market value if these same shares were sold in a change of control transaction. Stated another way by the court’s appraiser, the true value of the common stock is the salary and perquisites to be earned and derived from controlling the company. Ronald is the only family member employed by the company. His salary and other benefits are well documented in the record. Bruce is not employed by the company. He was once employed but his services have been terminated by Ronald. He has been deprived of his salary, pension, medical and other benefits. The only *309 benefit to Bruce of his one-half remainder interest is one-half the value of the business, or $25 million, not one-half the shares which have been shown by at least three appraisers to be worth little.
The trustees are under no duty to perpetuate the business enterprise and thus there is no obligation express or implied to warrant a physical division and distribution of the stock of these companies. At best the Will can be read as authorizing the trustees to continue the business if warranted. But it was not Harry’s intent by the grant of this power to enrich Ronald at Bruce’s expense. Even had the Will mandated an in-kind distribution of stock, the court, in the exercise of its equity power, would not enforce such a direction. So great is the injustice of permitting Ronald to reap the windfall from a change in circumstance that he and his cofiduciaries created, that no right-minded court could conclude otherwise. As stated by Justice Cardozo, "[when] a trustee finds upon his hands an investment, mandatory in its origin, but so changed as to be no longer mandatory, even if permitted * * * [, a] power of sale attachs in such circumstances by implication of law” (Mertz v Guaranty Trust Co., 247 NY 137, 144). It was the decedent’s clear intent that Ronald and Bruce benefit equally from their father’s estate. To that end, the trust shall be distributed in a manner consistent with his intent which may necessitate a sale of all or a part of the trust’s assets to a third party.
CONCLUSION
Accordingly, the motion for renewal is granted, and upon renewal the prior decision of this court which granted Ronald’s motion for summary judgment is vacated, and the trustees’ petition is granted. Ronald Winston, Bruce Winston and the trustees of the continuing trust for Bruce are directed to return to the trustees of the marital trust the stock that was distributed to them at Ronald’s direction.
Too often the court is confronted with a situation where the successful litigant achieves a hollow or pyrrhic victory because the subject of the litigation, or the source of recovery, has evaporated during the time it has taken to prevail. This case has all the ingredients for just such a result unless swift and extraordinary action is taken to stem the tide of loss and the compounding effect of overwhelming legal costs. The downward spiral of loss from the operation of HWI since Harry’s death is well documented in the corporate financial records on file with the court. Also well documented is Ronald’s professed inten *310 tion to preserve his birthright as the successor to Harry in whatever form or direction the company should take. To a large extent, Ronald’s desire to remain a part of the family enterprises and the trustees’ obligation of undivided loyalty to all beneficiaries present an irreconcilable conflict for Ronald as a trustee of the marital trust, as a trustee of the Genetic Research Trust, as an officer and director of the corporations, as a beneficiary and as a litigant.
The possibility for abuse or misuse of the power is clearly evident from the transaction that is the subject of this decision. It is not necessary for the court to determine if Ronald’s decision to distribute the stock in-kind was an abuse of discretion. Rather it is enough that Ronald continues to justify his action while at the same time acknowledging the debilitating effect on the value of his brother’s one-half remainder interest. Ronald’s continued adherence to a plan of distribution that implements a personal interpretation of his father’s desire to perpetuate the family enterprise under his management and control, under all circumstances, and with total disregard for the economic consequence to his brother, a coequal beneficiary, evinces an abject disregard for his paramount obligations as a fiduciary and a paramount concern for his personal welfare and his status as the highly visible and internationally regarded jewelry merchant. There are three trustees of this trust who individually and collectively possess the knowledge and expertise to make informed decisions concerning the settlement of the marital trust and the protection, preservation and distribution of trust assets. Because their decisions will undoubtedly affect Ronald personally as a beneficiary, as a litigant and as an employee of the corporations and as a trustee of the Genetic Research Trust it is only appropriate that all such decisions affecting the administration, settlement and distribution of the marital trust be made by a majority of the trustees and that Ronald not be permitted to overrule a decision of the majority by use of his power under Article Twelfth of the Will. Accordingly, the application to suspend Ronald’s Article Twelfth power with respect to the sale of the stock or other appropriate action concerning the disposition of the trust corpus is likewise granted.
The final application for permission to sell the stock of the corporation is granted to the extent that the trustees shall take whatever steps aré necessary to terminate the trust and effect an equal distribution of trust assets on whatever terms are most favorable to the remainderman which may include a *311 sale of all of the stock of both corporations to a third party, or parties, in a change of control transaction.
The foregoing is without prejudice to the motions and cross motions filed by Bruce Winston for summary judgment compelling the sale of all HWI and HWSA stock, the appointment of a temporary receiver, the issuance of supplemental citations, the addition of parties and other relief and the cross motions filed by Ronald Winston in opposition thereto, to consolidate and for sanctions.