In the Matter of the Estate of FRANK B. WOOD, Deceased. CHARLES R. WOOD, JR., Appellant; CHASE LINCOLN FIRST BANK, Respondent.

Second Department, March 23, 1992

## APPEARANCES OF COUNSEL

*McGovern, Connelly & Davidson (Frank H. Connelly, Jr.,* and *Margaret M. Fitzpatrick* of counsel), for appellant.

*Seacord, Young & Young (J. Addison Young II* of counsel), for respondent.

## OPINION OF THE COURT

RITTER, J.

Chase Lincoln First Bank's decision to liquidate the entire stock and bond portfolio of the Wood family trust was made immediately after the sole remainderman notified the bank of the death of his father, the income beneficiary. According to the will which established the trust, upon the death of the income beneficiary, the trustee was directed to "give the

principal of the fund" to the remainderman. Despite this directive, and without contacting the remainderman to learn his wishes, a wholesale liquidation of the trust portfolio was accomplished within a week. The result was a significant loss in the value of the trust principal.

■ Since there was only one remainderman, he was entitled to a distribution of the trust assets in kind (Restatement [Second] of Trusts § 345, comment *d,* at 194), and that was his wish. Once the income beneficiary died, the trustee was only permitted to sell a trust asset if it was essential to preserve capital before a distribution could be made (Restatement [Second] of Trusts § 344, comment *c,* at 191-192). The wholesale liquidation of the trust assets in this case did not preserve capital. It had the opposite effect—the trust was depleted.

The bank's justification for its precipitous action was that the stock market was volatile. In fact, the market was strong and rising, as it had been for two to three years preceding the ill-advised liquidation order. It was this steady growth that prompted the bank's trust officer to venture the opinion that a downward correction might be expected "at almost any time" and thus, he concluded, the market was volatile. The position does not withstand analysis. Accordingly, we reverse the Surrogate's decree approving the bank's final account and remit the matter to the Surrogate for the purpose of calculating a surcharge for the loss caused by the bank's action.

The trust in this case was created by a will probated in the 1920's. Charles R. Wood, Sr., was named income beneficiary for life, and his only child, Charles R. Wood, Jr., was the sole remainderman. Charles R. Wood, Sr., the father, died in December 1985. Soon after his death, the trustee, Chase Lincoln First Bank, was notified of the demise of Mr. Wood, Sr. Within days, all of the trust assets were liquidated and the proceeds were deposited in a money-market account. Charles R. Wood, Jr., first learned that the trust securities had been liquidated three months later when he received the bank's quarterly statement. He was dismayed and expressed his displeasure to the trust officer, Noel Warner. The liquidation had occurred without asking Mr. Wood, Jr., if he wished to receive the securities in kind, and it caused a substantial loss in the value of the portfolio. The trust officer assigned market volatility as the reason for the decision to liquidate. However, he declined to take responsibility for the decision and testified that his supervisor, John Molesphini, directed the sale. Mr. Molesphini was not called as a witness during the trial, but in

a pretrial deposition that was received in evidence, he was unable to recall whether he had ordered the sale. When pressed on the decision to liquidate, the trust officer, Noel Warner, explained that he believed that if the securities were held and declined in value before distribution, the bank was liable for the loss. Thus, securities were promptly converted to cash in the expectation "that the market value of the assets at date of death [will] closely resemble what we are going to distribute to the remaindermen."

The liquidated portfolio consisted of Treasury notes, blue chip stocks (including DuPont, Exxon, General Mills, AT&T, General Motors, and Baltimore Gas & Electric) and high-grade corporate debentures issued by AT&T and Ohio Bell. Since all of the stocks had been held in trust for many years,[1] a substantial profit was realized upon their sale because of the low cost of those securities when they were acquired. However, their value, if retained, would have been significantly higher than the net proceeds of sale.

Many of the same stocks had been owned by Charles R. Wood, Sr., in his own name, so they were part of his estate. Charles R. Wood, Jr., was executor and beneficiary of his father's estate, and, as of March 1986 when he first learned of the liquidation, he had not sold any of the stocks held by the estate, except DuPont and Exxon. The remaining stocks, except for AT&T, were significantly more valuable than they were in December 1985 when sold by the bank. An analysis of the bond liquidation is even more revealing.

The bonds were yielding, respectively, $8\frac{3}{4}\%$, $7\frac{7}{8}\%$ and $4\frac{3}{8}\%$, on a combined face value of $47,500. The premature sale caused a loss of $15,069—32% of the face amount of the bonds.

If the bonds had been left unsold, they would have generated much more income than the total yield on the net proceeds from the bond sale generated in the money-market funds while preserving the full face value of the debentures. The estate of Mr. Wood, Sr., included three identical telephone company bonds. Charles Wood, Jr., testified that it had been decided that they were to be held to maturity. He testified that he would have done the same with the bonds held in the family trust had they been received in kind. No one suggests that these bonds were in any jeopardy, so the

---

1. There is reason to believe that many, if not all, of the stocks were included in the trust portfolio when it was first funded during the 1920's.

order to liquidate the bonds cost the remainderman a tidy sum. Equally inexplicable was the conversion of the two Treasury notes to cash. They had been purchased in May and September 1985, only months before the death of Mr. Wood, Sr. Since they were sold above par, the interest yield on the notes sold exceeded the interest on Treasury notes available at the time of sale. John Molesphini acknowledged that short-term United States Government obligations were the equivalent of cash, yet the notes were liquidated like everything else in the portfolio.

Chase Lincoln First Bank is a professional fiduciary offering expert services through its estate and trust department. Its duty was to use its special skill in exercising care to preserve the trust property (Restatement [Second] of Trusts § 176). At the time in question, John Molesphini was the department manager supervising numerous estates and trusts. He had been in the trust field for over 30 years. Noel Warner was the trust officer assigned to the Wood trust, and, upon learning of the death of Mr. Wood, Sr., he reported to Mr. Molesphini for instructions. Warner is quite clear in his recollection that Molesphini gave him specific instructions to sell all the securities. Not so for Molesphini, who recalled a conversation with Warner about the death of Mr. Wood, Sr., but did not recall a specific instruction to liquidate. What Molesphini did recall was his concern with market volatility, which led him to conclude that the account should be reduced to cash to preserve capital. He explained that liquidation to cash was always the best way to preserve capital when a prompt distribution is to be made. According to Molesphini, this judgment was made without benefit of knowing what securities were in the Wood trust—a point that Warner disputed. Molesphini explained that he believed the market was volatile because stock prices had been rising for several years and a correction was expected "at almost any time". In fact, the market had been stable and up throughout December 1985 and beyond.[2]

Though he was still employed by the bank, Chase Lincoln

---

2. The only issue addressed at the hearing was whether the trustee should be surcharged for the loss sustained by the remainderman. Although the Surrogate did not reach the issue of damages, the parties stipulated that the court could take judicial notice of the prices published in the Wall Street Journal in order to establish a value for the individual securities in the trust portfolio on a particular date (see, CPLR 4533). The market reports published in the Wall Street Journal established that the individual securities in the trust portfolio were all trading higher on March 17, 1986, than they were on December 17, 1985, when they were sold by Chase Lincoln

First Bank did not call Molesphini during the trial. The only witness called by the bank was Noel Warner.

The bank argues that since title to the trust portfolio remained in the trustee until final distribution, the trustee was in complete control and could liquidate the assets at any time without regard to the remainderman's wish that the portfolio be distributed in kind.

Restatement (Second) of Trusts § 345 adopts the opposite view. Comment *d* to that section deals with the termination of a trust with a single beneficiary—the exact circumstance presented by the case under review. The Restatement declares: *"Conveyance of property in kind.* If upon the termination of the trust there is a single beneficiary who is entitled to the trust property, it is the duty of the trustee to convey the property to him, rather than to sell it and to pay him the proceeds, unless it is otherwise provided by the terms of the trust"* (Restatement [Second] of Trusts § 345, comment *d,* at 194).

The Court of Appeals has recently cited the Restatement as an authority in trust administration *(see, Mercury Bay Boating Club v San Diego Yacht Club,* 76 NY2d 256, 270; *see also, Matter of Rothko,* 43 NY2d 305, 321). We adopt the quoted portion of the Restatement as an authoritative declaration of the duty of a trustee upon termination of a trust with a single remainderman *(compare, Matter of Bulova,* 30 AD2d 321, relying on a companion section of the Restatement as authority for denying a trustee's attempt to sell the stock that was the entire trust corpus and directing that the stock be distributed in kind upon termination of the trust).

■ Since there was no power to sell for investment once the trust terminated (Restatement [Second] of Trusts § 344), the only possible justification for the trustee's action was that the

---

First Bank, with the exception of AT&T, which was trading about one point lower. The data published in the Wall Street Journal and news articles reporting on market trends, both in that authoritative newspaper and the New York Times, indicate that 1985 was a strong year for the New York Stock Exchange. Stock prices in the United States rose 25% during 1985, marked by an impressive final quarter. The Dow Jones Industrial Average (hereinafter Dow) broke through the 1,500 level in mid-December (New York Times, Dec. 30, 1985, section D, at 6, col 1). By the end of April 1986, the Dow had climbed 43% to record heights from its position in late September 1985. The close as of April 21, 1986 was 1,855 (New York Times, May 27, 1986, section D, at 8, col 3).

liquidation was undertaken to preserve capital.[3] That argument does not withstand analysis.

When sales by a trustee result in losses, the issue is whether a prudent person, dealing with his own property, would have given the order to liquidate to preserve capital (Restatement [Second] of Trusts § 176). In this case, the answer is obviously not. There is no evidence in the record that would justify a belief that the securities or bonds were expected to sustain a sudden loss of value if they were held and turned over in kind to the remainderman.

Basic to the relationship between a trustee and a trust beneficiary is the duty of fair dealing and the duty of communicating all the material facts to the beneficiary (Restatement [Second] of Trusts § 170). These duties were not discharged here despite the fact that the beneficiary was readily available. Indeed, it appears that this was a conscious strategy on the part of the bank, which takes the position that it had no duty to communicate with the beneficiary. Even more startling is the bank's claim that had the beneficiary told the trustee that he did not wish the securities liquidated, that request could have been freely ignored because the decision to liquidate would still be the trustee's alone. Once again, the Restatement view is to the contrary (Restatement [Second] of Trusts § 173, comment *d,* at 378-379; *see also,* Restatement [Second] of Trusts § 346).

■ The Surrogate found that the bank had an established procedure for termination of a trust and that the procedure was followed in this case. Molesphini and Warner agreed that there was a procedure, but they disagreed as to what the procedure was. The pivotal issue was whether individual investments were reviewed before a decision was made to hold securities for a distribution in kind or to liquidate for a distribution in cash. According to Molesphini, he was never

---

3. The Appellate Division, Third Department, in *Matter of Staunton* (27 AD2d 890), held that a trustee's liquidation of a trust portfolio for the purpose of distribution to the remaindermen (the settlor's five children) was appropriate in that case. A sharply falling market justified the quick sale, and because the five children lived in four different States, which implies that they were not readily accessible, there was no requirement that they be consulted first. All of these facts distinguish that case from this case.

The Surrogate relied on *Matter of Spitzmuller (Bankers Trust Co.)* (279 App Div 233, *affd* 304 NY 608), for the proposition that "there is no question that the trustee had the authority to sell securities". The stocks sold in *Spitzmuller* were highly volatile, trading at between $2 and $21. They were sold at $12 to preserve capital.

made aware of what assets were in the trust portfolio, so he left it to Warner and the bank's investment officer to decide whether the individual assets in the portfolio should be liquidated or held. Warner denied a role in the decision to liquidate. It is clear that the investment officer was never consulted concerning liquidation; rather, she was simply instructed to put through the sales. Warner claims that the liquidation decision was made by Molesphini after Warner showed him a list of the trust assets. The only conclusion warranted by this conflicting evidence is that no review of individual securities took place and no bank employee is willing to take responsibility for what was a very bad decision. Indeed, both Molesphini and Warner were particularly unresponsive when pressed to explain the decision to sell the telephone company bonds at a big loss. Thus, the Surrogate's conclusion that the bank's internal procedures were followed is not supported by the record.

Nor can the trustee's bad decisions be defended by a claimed fear of market volatility. The rising market continued until the crash in October 1987. While hindsight cannot be the measure of the prudence of an investment decision, neither is it permissible to claim as justification for a bad sale that, with the certainty of death and taxes, a rising market will eventually decline.

A sale made in preparation for termination of a trust may only be made to preserve capital. The judgment to sell must depend on how much a sale would yield and whether there is reason to believe that a failure to sell would result in a loss. Prudence requires an awareness of what is to be sold before the decision to sell is finalized. Molesphini said repeatedly that he had no knowledge of what was in the portfolio, so he claims that he left it to Warner and the investment officers to look at the securities to decide what should be sold and what should be held. Warner denies this and claims the responsibility for the decision to sell was Molesphini's. Whoever is responsible, the actions of the trust department of Chase Lincoln First Bank are not defensible. A surcharge must be imposed (see, Restatement [Second] of Trusts § 208).

ROSENBLATT, J. P. (concurring in result). I concur with the majority's result only to the extent that it rests on one salient fact, notably, that there was a single remainderman. On this record the trustee bank could have, and should have, but did not consult the remainderman before it fully liquidated the

trust assets to his eventual disadvantage. Accordingly, I see no need to address any further issue.

MILLER and O'BRIEN, JJ., concur with RITTER, J.; ROSENBLATT, J. P., concurs in result only.

Order that the decree is reversed, on the law and the facts, with costs to the appellant payable by the respondent personally, the judicial settlement of the account is vacated, and the matter is remitted to the Surrogate's Court, Westchester County, for further proceedings consistent herewith.