OPINION OF THE COURT
 

 Smith, J.
 

 The central issue in this case is whether, given the executors’ role and responsibility with respect to the assets of the estate, Surrogate’s Court abused its discretion in concluding that they breached their fiduciary duty, in imposing a surcharge for investment losses incurred by the estate on the coexecutors and in reducing the commission of the coexecutors. We conclude that there was no abuse of discretion.
 

 The coexecutors, who were paid handsomely for their services before and after the decedent’s death, failed to concern themselves as special experts with the investments through a period of precipitous decline. They were invested with personal and professional knowledge that should have guided their actions in fulfillment of fiduciary duties. They failed to act prudently within the framework of the obligation to preserve assets under the circumstances of this case and thus violated their fiduciary responsibilities to this estate.
 

 Carroll Donner, a resident of New York City, died on February 4, 1984 leaving a gross estate of more than $12.5 million. Her last will, dated May 27, 1983, was admitted to probate. By her will, the decedent bequeathed more than $2 million to several individuals and the Santa Barbara Museum, and the residuary to her alma mater, Mills College, in Oak
 
 *579
 
 land, California. The decedent appointed her longtime attorney and drafter of the will, Squire N. Bozorth, and her longtime, personal financial advisor, Duncan Miller, as coexecutors. Bozorth also served as attorney for Miller in Miller’s role as executor of the estate. The coexecutors received preliminary letters testamentary for the estate on March 26, 1984 and full letters testamentary on May 22, 1984.
 

 The major asset of the decedent’s estate was an inter vivas trust, which had been created on November 20, 1920 by her grandfather, of which Wilmington Trust Company (WTC), a Delaware corporation, was the trustee. The decedent was the income beneficiary of the trust and had a general testamentary power of authority over the principal. By her will, the decedent exercised that power of authority "by appointing all the property subject thereto to [her] Executors to be blended with [her] own estate and to pass as a part thereof.” On the date of her death, the 1920 trust had a value of $8,224,662. The decedent’s assets also included another trust, created by her grandfather on March 16, 1932, of which WTC also acted as the trustee. The 1932 trust instrument provided that the decedent would receive the income from the trust during her life, and that on her death three quarters of the trust principal was to pass to her brother. The decedent had testamentary power of appointment over the remaining one quarter of the principal, and she exercised that power by "appointing] the property subject thereto to [her] Executors, to be applied by them towards the payment of [estate, inheritance, legacy, succession or transfer] taxes.” At the time of the decedent’s death, approximately 80% of the 1920 trust and the 1932 trust consisted of interest-sensitive securities.
 

 In addition to being the financial advisor for the decedent during her lifetime, since 1965, coexecutor Miller had unlimited powers to direct the purchase and sale of the assets of the 1920 and 1932 trusts. Furthermore, although WTC, as trustee of the two trusts, charged full services and fees, coexecutor Miller acted as investment director and received compensation from WTC for that service. After the decedent’s death, coexecutor Miller continued to receive compensation for his role as investment director of the trusts.
 

 After the decedent’s death, the value of the securities in the trusts declined significantly due to a downward turn in the stock market. In addition, the decedent’s brother contested the decedent’s right to the property in the trusts. WTC com
 
 *580
 
 menced two separate proceedings in the Delaware Court of Chancery for instructions regarding the distribution of the property. By orders issued in July and August 1985, the court determined that the coexecutors were entitled to the entire principal of the 1920 trust and to one eighth of the value of the minority accumulation fund of the 1932 trust, and ordered WTC to provide the coexecutors with accountings for both trusts for the period from 1965 through 1984. Pursuant to the court orders, the coexecutors proceeded to collect the assets of the trust. WTC distributed the balance of the 1932 trust but stated that it would retain at least $2 million of the 1920 trust unless and until the coexecutors provided it with general releases from liability for any misconduct for both trusts. WTC also continued to pay itself commissions and administrative expenses on the $2 million it retained.
 

 Mills College, as residuary legatee of the estate, successfully obtained a reduction in the amount retained by WTC from $2 million to $1 million. WTC distributed the $1 million to the coexecutors who then transmitted it to Mills College.
 
 [1]
 

 WTC also provided the coexecutors with accountings for the 1920 and 1932 trusts pursuant to the court orders. On May 9, 1988, the coexecutors also filed an accounting of the estate, from the date of the decedent’s death to September 30, 1987. Appended to the coexecutors’ accounting were schedules, which included the accountings of WTC. The coexecutors asserted that the accountings of WTC were "in order.” The coexecutors’ accounting reflected combined principal and income on hand of $1,968,570.56 and calculated gains and losses against "inventory values.” The coexecutors forwarded copies of their accounting to the Attorney-General
 
 [2]
 
 and Mills College (the objectors). It was later determined that the "inventory values” were the values of the assets in the estate as of 1985, not as of the date of death, and that the estate had incurred substantially more losses during the period following decedent’s death until 1985 than were reflected in the accounting. Using date-of-death values, the objectors calculated that there had been more than $786,000 in losses on the sale of the assets in the estate.
 

 
 *581
 
 Thus, in August 1989, the Attorney-General and Mills College filed numerous objections to the accounting of the coexecutors. The objectors challenged,
 
 inter alla,
 
 (1) the failure of the coexecutors to collect the $1 million in estate funds that was retained by WTC, (2) certain expenditures by the coexecutors, including fees paid from estate funds for moving two sculptures, payment to counsel of WTC, fees paid by the estate for payroll services, and disbursements paid by the estate to two law firms, (3) compensation paid by WTC from the assets of the trusts to coexecutor Miller for his role as investment director, (4) losses incurred by the estate resulting from sale of assets by the coexecutors after the decedent’s death, and (5) commissions paid to the coexecutors in excess of those authorized by the trust instruments. Exhibit 89 of the objections was a schedule of the individual assets in the trusts, the date-of-death value of each asset, the date of sale, and the net proceeds from the sales. The objectors sought $5,991,587.40 in surcharges, plus interest, costs and allowances.
 

 During discovery, the objectors uncovered memoranda that had been prepared by one of coexecutor Bozorth’s senior associates indicating,
 
 inter alla,
 
 substantial losses in the securities held. The fact that the memoranda were prepared for but never delivered to the Attorney-General and Mills College indicates, as the Surrogate found, an attempt to withhold information. The memoranda stated,
 
 inter alla,
 
 that (1) the trust accountings with WTC were "directed accountings,” i.e., WTC did not have investment responsibilities because Miller, as financial adviser, directed the investments, (2) before the death of the decedent, the 1920 trust suffered total losses of more $3.7 million, among which were 13 securities, each of which experienced a 100% or virtual 100% loss, causing a total loss of $271,130.45 on those securities, (3) the commissions paid to WTC exceeded the commissions initially authorized by the trust instrument, (4) since the fair market values for the assets in the trust at the beginning and end of the accounting periods were not used in the accountings submitted by WTC, the over-all gains and losses during that period could not be fully evaluated, and (5) the objectors had standing to challenge the payment of Federal income taxes from the principal of the trusts since, if the money had been retained in the principal, it would have passed to Mills College.
 

 After a trial, Surrogate’s Court sustained the objections to
 
 *582
 
 the accounting, reduced the commission of the coexecutors and surcharged them for various acts of negligence in collecting the assets of the estate. The court,
 
 inter alla,
 
 (1) limited the coexecutors to a single commission, (2) directed the coexecutors to refund to the estate, with interest from the date of payment, any advance payment of commissions which exceeded the amounts authorized by the trust instruments, (3) ordered the coexecutors to repay to the estate any disbursements improperly paid to certain law firms, (4) directed the coexecutors to repay to the estate the costs of moving two sculptures and the fees paid for payroll tax services, and (5) ordered the coexecutors to pay to the estate the actual investment losses from the date of death until the assets were sold and collected, without interest. On cross appeals, the Appellate Division affirmed for the reasons stated in the decision of Surrogate’s Court, and certified the following question to this Court:
 

 "Were the Surrogate’s determinations, limiting the co-executors to a single commission and surcharging said co-executors for losses to the estate and for improper disbursements, an abuse of the Surrogate’s discretion, given the facts as affirmed by this Court?”
 

 The parties make numerous arguments on this appeal. Coexecutor Bozorth argues that Surrogate’s Court abused its discretion in imposing a duty of investment management on the coexecutors before the assets of the trust were distributed to the estate. He urges that at the time that the assets of the trusts incurred the losses for which they were surcharged, the trusts were under the management of WTC, and that coexecutor Miller’s role as investment director for the trusts and Bozorth’s knowledge of that role did not give rise to a duty of investment management on the part of Miller and Bozorth in their executorial capacity. Bozorth also claims that Surrogate’s Court abused its discretion in measuring the investment losses and calculating the surcharges using date-of-death values since the coexecutors had no authority to act until letters testamentary were issued, and that Surrogate’s Court failed to perform an investment-by-investment analysis of each security that made up the assets of the trusts, or to make any finding as to when it became imprudent for the coexecutors to retain the assets, before it imposed a blanket surcharge on the coexecutors. Bozorth urges further that Surrogate’s Court misapplied the burden of proof and failed to consider many
 
 *583
 
 significant factors, including the offset of investment gains against investment losses, militating against the imposition of the surcharge. Finally, Bozorth claims that Surrogate’s Court abused its discretion in denying the coexecutors their statutory commission representing compensation for the performance of executorial duties.
 

 Coexecutor Miller does not argue that he and his coexecutor had no authority to act as of the date of the decedent’s death. Instead, he urges that the coexecutors acted in a prudent and diligent manner in the care and management of the assets of the estate, and that they opted to retain the assets in the trusts during an 18-month period of adverse market conditions and to await a more advantageous time to sell at higher prices. Miller argues, in addition, that Surrogate’s Court improperly shifted the burden of proof on the issues of prudence or negligence from the objectors to the coexecutors. Miller also challenges Surrogate’s Court’s use of date-of-death values to calculate the surcharges, and adds that Surrogate’s Court abused its discretion in surcharging the coexecutors for losses amounting to $116,237 incurred by the estate in connection with the investments sold between September 1985 and November 1985 at the direction of Mills College, and for $84,074.90 for fees paid by WTC for his role, postdeath, as investment director. Moreover, Miller contends, compliance with Surrogate’s Court’s directive — that the coexecutors seek to recover, in the appropriate Delaware court, the amounts relating to predeath investment losses incurred by the trusts —would violate the doctrine of collateral estoppel and constitute a waste of estate assets. Finally, Miller argues that Surrogate’s Court erroneously deprived the coexecutors of the commissions, pursuant to SCPA 2307, for performing their fiduciary duties with respect to the estate.
 

 The objectors assert that Surrogate’s Court did not abuse its discretion in surcharging the coexecutors for failing to act promptly and prudently to preserve the assets of the estate or in reducing the commissions of the coexecutors. The objectors assert further that Surrogate’s Court properly reduced the commission of the coexecutors because the record supports the finding that the coexecutors intentionally concealed material facts about the estate, including Miller’s role as investment director of the trust before and after the decedent’s death, the existence of substantial losses to the estate after the decedent’s death, and the detailed memoranda prepared by Bozorth’s firm for Mills College and the Attorney-General.
 

 
 *584
 
 At the outset, it should be noted that the coexecutors were fiduciaries who owed a duty of undivided loyalty to the decedent and had a duty to preserve the assets that she entrusted to them. In
 
 Meinhard v Salmon
 
 (249 NY 458, 464), as to the level of conduct required for fiduciaries, Chief Judge Cardozo stated:
 

 "Many forms of conduct permissible in a workaday world for those acting at arm’s length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the 'disintegrating erosion’ of particular exceptions
 
 (Wendt
 
 v.
 
 Fischer,
 
 243 N. Y. 439, 444). Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd. It will not consciously be lowered by any judgment of this court.”
 

 Surrogate’s Court’s findings of fact as to the conduct of the coexecutors were affirmed by the Appellate Division, and our review is limited to whether there is evidence in the record to support those findings and to the legal issues raised
 
 (see, Matter of Rothko,
 
 43 NY2d 305, 318).
 

 First, while the authority of executors is derived from the will
 
 (Hartnett v Wandell,
 
 60 NY 346, 349-350), it is clear that, in this case, the coexecutors had a duty to preserve the assets of the estate even prior to obtaining letters testamentary. This is true since Miller was responsible for investment decisions at the time of the decedent’s death. Indeed, he made those decisions long before her death. Given their relationship to the testatrix, the executors had a duty to preserve the assets of the estate from the moment of death to insure that they were protected for the persons or entities eventually entitled to receive them. Furthermore, "an executor who knows that his coexecutor is committing breaches of trust and not only fails to exert efforts directed towards prevention but accedes to them is legally accountable”
 
 (Matter of Rothko,
 
 43 NY2d, at 320,
 
 supra).
 
 The record is clear that the attorney fiduciary was aware of the losses but did not act with the prudence required by the circumstances.
 

 
 *585
 
 Here, Surrogate’s Court found that the coexecutors did not fulfill their duty, which arose from their unique status vis-ávis the decedent, to preserve the assets of the estate and to prevent losses incurred by the estate after the decedent’s death. The record amply supports the findings of Surrogate’s Court that coexecutor Miller, as investment director of the 1920 and 1932 trusts, had complete authority to direct sales and purchase assets in the trust before as well as after the decedent’s death; that from the decedent’s death through 1985, the estate incurred losses in assets of more than $786,000; that the coexecutors knew that a major part of the assets in the estate were interest rate sensitive securities, which values had been declining due to a downfall in the stock market; that, after the decedent’s death, the coexecutors did not act prudently to preserve the investments. Thus, Surrogate’s Court did not abuse its discretion in finding that the coexecutors did not satisfy their duty to preserve the assets of the estate and in imposing surcharges on them for the losses incurred by the estate.
 

 Next, the surcharges imposed by Surrogate’s Court were proper. "To warrant a surcharge, the objectors must show that the trust’s losses resulted from the trustee’s negligence or failure to exercise such prudence”
 
 (Matter of Hahn,
 
 93 AD2d 583, 586,
 
 affd
 
 62 NY2d 821). Whether a surcharge should be imposed in this instance depends on "a balanced and perceptive analysis of [the coexecutors’] consideration and action in the light of the history of each individual investment, viewed at the time of its action or its omission to act”
 
 (Matter of Bank of N. Y.,
 
 35 NY2d 512, 519). Thus, our inquiry becomes whether the record supports the finding that the coexecutors did not act in good faith and failed to exercise " ' "such diligence and such prudence in the care and management [of the fund], as in general, prudent men of discretion and intelligence in such matters, employ in their own like affairs” ’ ”
 
 (id.,
 
 at 518-519, quoting
 
 Matter of Clark,
 
 257 NY 132, 136). "Normally, the determination of whether the conduct of a trustee measures up to the appropriate standards of prudence, vigilance and care, is a fact to be found by the trial court”
 
 (Matter of Hubbell,
 
 302 NY 246, 258).
 

 Although coexecutor Miller claims that the coexecutors chose to retain the assets of the trusts and to await favorable market conditions, the record supports the Surrogate’s finding that the coexecutors failed to act prudently to prevent the
 
 *586
 
 losses incurred by the estate after the decedent’s death. With the exception of raising cash for advance payment of their commissions and legal fees, the coexecutors took no action with respect to the investments. We conclude that, here, the indifference and inaction by the coexecutors justifies the imposition of the surcharge on them for postdeath losses incurred by the estate.
 

 As stated, we are not persuaded by the claim by the coexecutors that they had no authority to act on the date of the decedent’s death, and, thus, we discern no abuse of discretion by Surrogate’s Court in using date-of-death values to calculate the amount of the surcharge to impose on the coexecutors. Nor, are we persuaded by the argument of the coexecutors that Surrogate’s Court did not perform stock-by-stock analysis to determine the exact date when it became imprudent to retain each of the stocks. The record before us indicates that Surrogate’s Court based its decision to impose the surcharge,
 
 inter alla,
 
 on exhibit 89 to the objections, which was a schedule of the individual assets in the trusts, the date-of-death value of each asset, the date of sale, and the net proceeds from the sales. Moreover, Surrogate’s Court imposed the surcharge because the coexecutors exhibited a "lack of knowledgeable investment decision” and did not demonstrate a postdeath "review of the investments that was responsive to losses of over $780,000,” and imposed the surcharge on actual investment losses incurred by the estate from the date of death until the assets were sold and collected.
 

 Miller’s argument that the surcharges should be reduced by the amount paid by WTC for his services as investment director, after the decedent’s death, and by the amount of losses incurred by the sale of investments at the direction of Mills College, lacks merit. The finding of Surrogate’s Court that Miller did not provide the advisory services for which he had been paid is supported by the record. Furthermore, Miller and Bozorth, and not Mills College, were coexecutors of the estate. It was their duty to preserve the estate’s assets with prudent conduct.
 

 Miller’s opposition to the directive of Surrogate’s Court that the coexecutors seek to recover, in the appropriate Delaware court, predeath losses incurred by the trusts is untenable. The predeath losses involve assets of trusts that were located in Delaware and of which a Delaware company was trustee. These issues should be resolved by the Delaware courts.
 

 
 *587
 
 We discern nothing in the record to support the claim by the coexecutors that Surrogate’s Court incorrectly placed the burden of proof on them and failed to consider the factors militating against the imposition of the surcharge.
 

 Finally, the claim by the coexecutors that the Surrogate abused her discretion in denying them their commissions for the performance of executorial duties is unavailing. There is evidence in the record, including the undelivered memoranda, to support the finding by the Surrogate that the coexecutors intentionally withheld information from and acted contrary to the interests of Mills College by concealing the actual losses incurred by the estate, and by claiming commissions on an inflated value of the estate and in excess of those authorized by the trust instruments.
 

 Accordingly, the order of the Appellate Division should be affirmed, with costs payable personally by appellants, and the question certified answered in the negative.
 

 Chief Judge Kaye and Judges Simons, Titone, Hancock, Jr., Bellacosa and Levine concur.
 

 Order affirmed, etc.
 

 [1]
 

 . At present there remains approximately $1 million uncollected from the 1920 trust.
 

 [2]
 

 . The Attorney-General appears in this action pursuant to EPTL 8-1.4 (e) (1), which requires service upon the Attorney-General of notice of any action or proceeding in which any trustee holds property or income which may be required to be devoted for charitable purposes.