[643 NYS2d 972]

In the Matter of the Estate of RODNEY B. JANES, Deceased. LINCOLN FIRST BANK, N. A. (Successor by Consolidation to LINCOLN FIRST BANK OF ROCHESTER) as Coexecutor of RODNEY B. JANES, Deceased, Appellant; HOWARD ULLMAN, as Personal Representative of the Estate of CYNTHIA W. JANES, Deceased, et al., Respondents. (Appeal No. 2.)

Fourth Department, May 31, 1996

APPEARANCES OF COUNSEL

*Nixon, Hargrave, Devans & Doyle, L. L. P.,* Rochester *(William S. Brandt* and *Edward G. Case* of counsel), for Chase Lincoln First Bank, N. A., appellant.

*Williams & Williams,* Rochester *(Mitchell T. Williams* and *Kenneth Joyce* of counsel), for estate of Cynthia W. Janes, respondent.

*Dennis C. Vacco, Attorney-General,* Albany *(Troy J. Oechsner* and *Barbara Gott Billet* of counsel), for Ultimate Charitable Beneficiaries, respondent.

*Gates & Adams,* Rochester *(Anthony J. Adams, Jr.,* of counsel), for Shriners Hospitals for Crippled Children, *amicus curiae.*

*Sullivan & Cromwell,* New York City *(H. Rodgin Cohen, Philip L. Graham, Jr., Basil P. Zirinis, III,* and *Holly H. Weiss* of counsel), for New York Clearing House and another, *amici curiae.*

## OPINION OF THE COURT

DENMAN, P. J.

The question before us is whether a coexecutor was properly held liable for losses to an estate allegedly resulting from the failure of the coexecutor to diversify its investment of estate assets. If we determine that liability was properly imposed, we must then determine the proper measure of damages to be assessed against the coexecutor for its negligent retention of estate assets. We conclude that the Surrogate properly found the coexecutor liable for its negligent failure to diversify and for its inattentiveness, inaction, and lack of disclosure, but that the Surrogate adopted an improper measure of damages.

I

Petitioner, Lincoln First Bank, N. A., appeals from a judgment of Surrogate's Court that sustained objections by the estate of Mrs. Cynthia W. Janes and by the Attorney-General to the settlement of petitioner's account as coexecutor of the estate of Rodney B. Janes. The Surrogate found that petitioner was negligent in managing the estate's portfolio, particularly in retaining a large concentration of Eastman Kodak stock over a period of many years during which the value of the stock dropped from about $140 per share to as low as approximately $40 per share. As a result of that finding, the Sur-

rogate ordered petitioner to pay "lost profit" damages based on the $1,687,647.30 value of the Kodak stock on August 9, 1973, the date by which the Surrogate held that petitioner should have sold most of the Kodak stock, multiplied by the cumulative rate of return subsequently achieved on a well-diversified stock fund managed by petitioner, offset by the dividends and proceeds attributable to the estate's ownership and ultimate sale or transfer of the Kodak stock (*Matter of Janes*, 165 Misc 2d 743). Petitioner thus was ordered to pay damages of $6,080,269 plus prejudgment interest of $479,758.20 from October 1, 1994 through August 17, 1995, and was ordered to remit $30,000 previously paid to petitioner as a commission and $296,302.66 previously paid to petitioner's attorneys for their defense of the surcharge proceeding, for a total award of $6,886,329.86, plus postjudgment interest, costs, and disbursements. Additionally, petitioner was ordered to forfeit further commissions as coexecutor of the estate of Rodney Janes.

On appeal, petitioner contends that the Surrogate erred in finding that petitioner's decision to retain the Kodak stock was imprudent; in holding that petitioner was under a duty to diversify by August 9, 1973; and in measuring damages based upon "lost profits".

## II

Rodney Janes died on May 26, 1973, survived by his widow, Cynthia Janes, who was then 72. Janes left an estate valued at approximately $3,500,000, the bulk of which, approximately $2,500,000, was in equities. Most of his stock portfolio was concentrated in Kodak stock, 13,232 shares with a date of death value of about $135 per share, or approximately $1,800,000. Janes's will named Cynthia Janes and petitioner Lincoln First Bank (actually, its predecessor, Lincoln Rochester Trust Company) as coexecutors of the estate. The will bequeathed most of the estate to three trusts: one purely charitable, and two split-interest, with the income of the split-interest trusts generally to be paid to Cynthia Janes for her life, and thereafter to certain charities. The will named petitioner as sole trustee of the trusts.

Letters testamentary were issued on July 3, 1973. Two bank employees, Richard Young and Ellison Patterson, were assigned to manage the estate and trusts. In early July 1973, Young met with Cynthia Janes several times and ascertained her income needs, the estate's assets, and the estate's needs for cash to pay taxes, commissions, attorney's fees, and specific

bequests. On August 3, 1973, Young related his estimate of the cash requirements to Patterson. On August 9, 1973, Patterson wrote a proposal to raise the necessary cash by selling certain assets of the estate, including 800 shares of Kodak stock. Without mentioning potential risks associated with the high concentration of Kodak stock, or further discussing investment strategies, the proposal stated: "It would appear the remaining issues can be held until the trusts are funded." As of early August 1973, Kodak stock was trading at about $139 per share. Thus, the estate's 13,232 shares of Kodak stock were worth approximately $1,840,000, or more than 71% of the estate's stock holdings.

On September 5, 1973, Young and Patterson met with Mrs. Janes to explain the proposal. Mrs. Janes, who had a high school education and no business training or experience, and who had never been employed, consented to the sale of 1,232 shares of Kodak stock in order to raise cash for the estate. That was the last meeting between bank officers and Mrs. Janes devoted to investment issues. The bank never communicated with the various charitable beneficiaries.

Almost immediately thereafter, the price of Kodak stock declined steeply to about $109 at the close of 1973, to about $63 by the close of 1974, and to about $51 by the end of 1977. The stock hit its post-1973 low of about $40 per share in March 1978. The stock was selling at $45 per share in February 1980 when petitioner filed its initial accounting. By August 1981, when petitioner instituted this proceeding for judicial settlement, the stock was valued at about $65 per share. The Kodak stock traded at an adjusted price (adjusted for a 3-for-2 stock split in 1985) of about $92 per share at the end of October 1986, and about $127 per share on July 8, 1987. Large blocks of Kodak stock were either sold or transferred to the trusts on those dates, 7,333 shares on October 31, 1986, and 2,842 shares on July 8, 1987 (the number of shares being adjusted for the split in 1985). Prior to that, petitioner had divested the estate of only the 1,232 shares originally sold in September 1973, 100 shares conveyed in May 1978, and an additional 580 shares transferred in June 1978, when the stock was near its post-1973 low.

Following the initial sale of 1,232 shares in September 1973, over one half of the estate's value, and more than two thirds of its equity holdings, remained concentrated in Kodak stock. Thus, the drastic decline in the value of Kodak stock after August 9, 1973 had a significant negative impact on the value

of the estate. At times, the loss to the estate exceeded $1,100,000.

Beginning in February 1980, petitioner filed its initial accounting and a series of supplemental accountings that together covered the period from July 3, 1973 through June 30, 1994. In August 1981, petitioner sought judicial settlement of its account. Mrs. Janes filed objections in February 1982. Subsequently, the Attorney-General filed objections on behalf of the charitable beneficiaries (see, EPTL 8-1.4 [m]). When Mrs. Janes died in 1986, the personal representative of her estate was substituted as an objectant.

A trial on the objections was conducted in October and November 1994. The Surrogate heard testimony establishing the foregoing facts and also heard conflicting expert testimony concerning whether petitioner was negligent. Further, the Surrogate heard the testimony of objectants' expert on various measures of damages, including damages based on a theory of lost profits or appreciation, measured by what the proceeds from a sale of Kodak stock in August 1973 would have grown to if invested in diversified stock. Petitioner put in no proof on the issue of damages.

The Surrogate found that petitioner had breached its fiduciary duty in failing to diversify by divesting the estate of nearly all of the Kodak stock by August 9, 1973. The Surrogate held that petitioner had acted imprudently in ignoring the concentration of Kodak stock, failing to consider the income needs of Mrs. Janes and the charities, failing to protect the estate against the precipitous drop in the value of the Kodak stock, and failing to communicate with the beneficiaries. On the issue of damages, the Surrogate adopted the approach of objectants' expert, i.e., the use of past stock performance to determine what a prudent fiduciary would have earned by diversifying the estate's holdings. Using petitioner's own diversified equity fund as a measure, the Surrogate found that a sale of 12,087 shares of Kodak stock in August 1973 would have yielded $1,687,647.30, which, if invested in the Lincoln First Income Development Trust, would have grown to $6,080,269 by the time of trial. The Surrogate surcharged petitioner that sum plus posttrial interest, ordered petitioner to reimburse the estate for the expenses of petitioner's own attorneys, and directed it to forfeit and remit its commissions as fiduciary (Matter of Janes, 165 Misc 2d 743, 756-758, supra).

This appeal ensued.

## III

Petitioner's conduct as a fiduciary is to be judged by the Prudent Person Rule, codified in EPTL 11-2.2. Under that rule, a fiduciary "holding funds for investment may invest the same in such securities as would be acquired by prudent men of discretion and intelligence in such matters who are seeking a reasonable income and preservation of their capital" (EPTL 11-2.2 [a] [1]; *see also*, EPTL 11-2.1 [a] [1]; *Matter of Donner*, 82 NY2d 574, 585; *Matter of Bank of N. Y.*, 35 NY2d 512, 518-519; *Matter of Hahn*, 93 AD2d 583, 586, *affd* 62 NY2d 821; *King v Talbot*, 40 NY 76, 85-86). The failure to act as a prudent person would have acted constitutes negligence for which a fiduciary may be surcharged and made to forfeit commissions (*see generally, Matter of Donner, supra*, at 585-587; *Matter of Hahn, supra*, at 586; *Matter of Mendleson*, 46 Misc 2d 960, 978). In determining whether a fiduciary should be surcharged, the court must undertake " 'a balanced and perceptive analysis of [the] consideration and action [of the fiduciary] in the light of the history of each individual investment, viewed at the time of its action or its omission to act' " (*Matter of Donner, supra*, at 585, quoting *Matter of Bank of N. Y., supra*, at 519). Thus, the focus is on individual securities rather than the portfolio as a whole; the fact that there is an over-all increase in the value of the portfolio does not exonerate a fiduciary from liability for losses sustained with respect to particular imprudent investments (*Matter of Bank of N. Y., supra*, at 517; *see also, Matter of Morgan Guar. Trust Co.*, 89 Misc 2d 1088, 1091-1092). "To hold to the contrary would in effect be to assure fiduciary immunity in an advancing market" (*Matter of Bank of N. Y., supra*, at 517). On the other hand, "[t]he record of any individual investment is not to be viewed exclusively, of course, as though it were in its own water-tight compartment, since to some extent individual investment decisions may properly be affected by considerations of the performance of the fund as an entity, as in the instance, for example, of individual security decisions based in part on considerations of diversification of the fund or of capital transactions [intended] to achieve sound tax planning for the fund as a whole" (*Matter of Bank of N. Y., supra*, at 517).

The conduct of a fiduciary is to be judged by the facts that it knew or should have known at the time the investment decision was made (*Matter of Bank of N. Y., supra*, at 519; *Matter of Clark*, 257 NY 132, 136). "It is not sufficient that hindsight suggests that another course of action would have been more

beneficial" (*Matter of Atkinson*, 148 AD2d 839, 841; *see, Matter of Miller*, 116 AD2d 580, 581, *lv dismissed* 67 NY2d 609, 1028). "Our courts do not * * * hold a trustee to prescience in investment decisions" (*Matter of Bank of N. Y., supra*, at 519, citing *Matter of Hubbell*, 302 NY 246, 257). Fiduciaries " 'are not required to foresee the future of investments in this or that particular enterprise' " (*Matter of Cowles*, 22 AD2d 365, 377, *affd* 17 NY2d 567, quoting *Matter of Hubbell, supra*, at 257). "A wisdom developed after an event and having it and its consequences as a source is a standard no [person] should be judged by" (*Costello v Costello*, 209 NY 252, 262).

Additionally, a fiduciary will not be held liable for a mere error in investment judgment (*Matter of Bank of N. Y., supra*, at 519). Investment decisions typically present a choice among myriad alternatives, some more or less prudent, and some imprudent, and the mere availability of other prudent courses of action that a fiduciary could have pursued does not support a finding that the fiduciary acted imprudently in choosing one such course. Certainly, "[a]ll men of honesty, prudence and enlightenment do not think alike" concerning investment decisions (*Costello v Costello, supra*, at 264). For that reason, a fiduciary's conduct is not judged strictly by the success or failure of the investment (*Matter of Morgan Guar. Trust Co., supra*, at 1090, 1092). In short, the test is prudence, not performance, and therefore evidence of losses following the investment decision does not, by itself, establish imprudence (*Matter of Cuddeback*, 168 Misc 698, 702). "Our courts do not demand investment infallibility" (*Matter of Bank of N. Y., supra*, at 519), and a fiduciary "is neither insurer nor guarantor of the value of a trust's assets" (*Stark v United States Trust Co.*, 445 F Supp 670, 678 [SD NY, applying New York law]).

On the other hand, a fiduciary will be surcharged for losses resulting from negligent inattentiveness, inaction, or ill consideration (*see, Matter of Donner, supra*, at 586; *Matter of Wood*, 177 AD2d 161, 167-168). Thus, while mere erroneous judgment or poor investment performance cannot be the basis of a finding of imprudence, where the facts known at the time of the decision establish its unreasonableness, a finding of imprudence is warranted (*see, Matter of Wood, supra*, at 167-168). Generally, the determination whether a fiduciary's conduct measures up to the appropriate standards of prudence, vigilance, and care is an issue of fact for the trial court (*see, Matter of Donner, supra*, at 585, citing *Matter of Hubbell, supra*, at 258; *see also, Matter of Yarm*, 119 AD2d 754).

Petitioner challenges the Surrogate's finding that it acted imprudently in retaining the Kodak stock to the extent that it exceeded 5% of the estate's portfolio, i.e., in failing to divest the estate of 12,087 of the 13,232 shares of Kodak stock by August 9, 1973. Petitioner contends that New York law does not impose an absolute duty to diversify, and that its decision to retain the Kodak stock did not violate the Prudent Person Rule because the decision was well considered based on appropriate factors, chiefly that Kodak was a "great stock."

A number of decisions state that a fiduciary has no absolute duty to diversify and that a mere failure to diversify is, absent " 'other elements of hazard' ", not imprudent *(Matter of Newhoff,* 107 AD2d 417, 421, *lv denied* 66 NY2d 605; *see, Matter of Flint,* 240 App Div 217, 228, *affd* 266 NY 607; *Matter of Newhoff,* 107 Misc 2d 589, 595; *Matter of Mendleson, supra,* at 967; *Matter of Kellogg,* 35 Misc 2d 541, 551; *Matter of Kilmer,* 18 Misc 2d 60, 68; *Matter of Gottschalk,* 167 Misc 397, 409; *Matter of Sheldon,* 160 Misc 194, 196; *Matter of Balfe,* 152 Misc 739, 755-756, *mod on other grounds* 245 App Div 22; *Matter of Adriance,* 145 Misc 345, 352). Some commentaries cite that principle as the law of New York and place New York among those jurisdictions that do not require diversification *(see, e.g.,* Annotation, *Duty of Trustee to Diversify Investments, and Liability for Failure to Do So,* 24 ALR3d 730; *see also,* 106 NY Jur 2d, Trusts, § 374; 76 Am Jur 2d, Trusts, § 542). Nevertheless, a number of cases seem to hold to the contrary. For example, in *Durant v Crowley* (197 App Div 540, *affd* 234 NY 581), a trustee was surcharged for his negligence in investing nearly one half of the trust assets in a particular mortgage. In *Matter of Curtiss* (261 App Div 964, *affd* 286 NY 716), the Court imposed a surcharge "because of negligence in respect of want of diversification." In neither case was there mention of any need to show other elements of hazard as a basis for liability. In *Cobb v Gramatan Natl. Bank & Trust Co.* (261 App Div 1086), the Court held that the trustee "was grossly negligent as a matter of fact and as a matter of law" in investing the entire $25,000 corpus of a trust fund in a single mortgage certificate. In so holding, the Court stated that "the law * * * imperatively requires diversity", and did not mention either the existence of other risk factors or the need to show them in order to establish liability *(Cobb v Gramatan Natl. Bank & Trust Co., supra,* at 1086; *see, Kahn v Kahn,* 147 Misc 2d 954, 959 ["(I)nvestment of a large portion of trust funds in a single security may be the basis of a finding of imprudence"]; *cf., President & Directors of*

*Manhattan Co. v Erlandsen*, 36 NYS2d 136, 140, *affd* 266 App Div 883; *Matter of Harbeck*, 142 Misc 57, 64; *but see, Matter of Flint, supra,* at 228 [held investment of $45,000 fund in 11 mortgages sufficiently diverse: "We do not have here the investment of the whole or greater part of a trust fund in a single property, coupled with other elements of hazard"]).

Thus, in appropriate circumstances, liability for imprudence may be predicated solely on a fiduciary's investment of a large portion of the estate or trust fund in a single security, regardless of whether the concentration is coupled with other elements of hazard. As noted *supra,* it is the holding of *Cobb* that "the law * * * imperatively requires diversity" (*Cobb v Gramatan Natl. Bank & Trust Co., supra,* at 1086). In contradistinction, there is relatively weak support for petitioner's assertion that the failure to diversify, standing alone, can never support a surcharge. A fairer and more persuasive reading of the cases is that, although there is no absolute duty to diversify in all circumstances, and although a failure to diversify will not automatically result in liability, neither is a fiduciary automatically insulated from liability based on a "mere" failure to diversify where the lack of diversification itself presents an unreasonable risk to the assets of the estate or trust. That is the view adopted in the Restatement (Second) of Trusts § 228, which states that a trustee is under a duty to the beneficiary to distribute the risk of loss by a reasonable diversification of investments, "unless under the circumstances it is prudent not to do so", and that the trustee ordinarily should not invest the whole or an unreasonably large proportion of the trust property in a single type of security or particular industry, let alone in a single security. Further, the thrust of the Comment and Illustrations in the Restatement is that investment of one half the trust funds in a single security would ordinarily be a breach of trust.

## IV

█ Here, the Surrogate properly imposed liability on the fiduciary for its initial imprudent failure to diversify as well as for its subsequent indifference, inaction, nondisclosure, and outright deception in response to the prolonged and steep decline in the worth of the estate. The Surrogate's finding of imprudence is well supported by the testimony of objectants' experts, who opined that the large concentration of Kodak stock was "speculative" and represented an "enormous risk" and a "dangerous situation" for the estate. Objectants' experts

testified that a prudent investment manager would have minimized that risk by moving immediately, "as soon as possible after appointment as executor", to reduce the amount of Kodak stock in the estate to no more than 5% of its portfolio. They testified that a prudent fiduciary would have liquidated the Kodak stock and reinvested the proceeds by August 9, 1973.

Further, the Surrogate's finding of imprudence is supported by petitioner's own internal guidelines for trust and estate management, which provide that the ideal objective is to provide a reasonable rate of return with the lowest possible risk. Petitioner's own criteria state that diversification reduces financial risk and therefore is desirable; that investment concentration may lead to greater instability of income and principal than a well-diversified portfolio; and that concentrations are acceptable, but only where income is adequate, top quality stocks are involved, the portfolio is closely monitored, and the beneficiaries have given informed consent.

Contrary to the testimony of objectants' experts and in contravention of petitioner's own guidelines, petitioner's expert testified that diversification is unethical and a breach of fiduciary responsibility. That opinion was properly rejected by the Surrogate as erroneous. Further, the Surrogate properly rejected, as not "seriously advanced," petitioner's expert's assertion that a 100% concentration of the estate assets in Kodak stock would have been prudent (*Matter of Janes, supra,* at 755). Petitioner argues that retention of the Kodak stock was prudent because it was "a world class grade A blue chip security with an extraordinary performance history of stability and growth," in short, a "great stock." The Surrogate properly rejected that argument because it ignores the risks inherent in putting most of one's eggs in one basket. It overlooks the fact that diversifying one's investments diffuses the risk of loss and thus appreciably diminishes that risk. It also overlooks the fact that diversification is desirable because there is more than one "great stock."

The evidence establishes that, in violation of prudent practice and its own guidelines, petitioner never made a formal analysis of the estate assets, implemented any formalized investment plan, or established any investment goals for the benefit of either the income beneficiaries or the remaindermen. The record contains petitioner's periodic summaries of the estate's stock holdings by industry and company. Each summary typically bears the stamped notation "concentration," referring to the Kodak stock, but there is no evidence that

petitioner ever considered the risk presented by the Kodak holding. Prior to 1976, petitioner did not have a written review process for trusts and estates. In 1976, petitioner instituted a written review process, pursuant to which any concentration of stock over 20% had to be explained in writing. The record contains review sheets dated November 30, 1976, May 31, 1977, November 30, 1977, and November 30, 1978. Each sheet answers "yes" to the question, "[Are] there either company or industry common stock positions in the portfolio representing 20% or more of the entire estate?" The form also asked whether "anything can be done, has been done, or will be done in order to improve diversification." The forms, in chronological order, record the following responses by petitioner's portfolio manager: "Nothing being done in the estate—when trusts funded some sales to be conducted"; "EK—yes when partial trust funding is done"; "Several meetings held—but Mrs. Janes directed retention of Xerox and Kodak"; "EK— letters to hold are on file." In fact, petitioner had no such letters and there had been no meetings.

Mrs. Janes never consented to or ratified petitioner's retention of the concentration of Kodak stock, and the Surrogate properly rejected petitioner's argument that she did (*see, Matter of Newhoff, supra*, at 594; *Matter of Young*, 249 App Div 495, 501, *affd* 274 NY 543; *Matter of Mendleson*, 46 Misc 2d 960, 976-977, *supra*). The documentary evidence establishes that, in September 1973, Mrs. Janes consented only to the sale of 1,232 shares of Kodak, not to the retention of the remaining 12,000 shares. Contrary to petitioner's contention, there is no legal significance to the remark of Mrs. Janes that she and Mr. Janes "loved" Kodak stock. During the remainder of its administration of the estate, petitioner had no further communication with Mrs. Janes concerning retention of the Kodak stock or other investment decisions, and had no communication at all with the charitable beneficiaries. Indeed, petitioner seems to have adopted the position that, as executor, it had to account only to the trustee, i.e., to itself, not to Mrs. Janes or the charitable beneficiaries. The law is to the contrary (*see, Matter of Wood*, 177 AD2d 161, 167, *supra*). Petitioner's imprudence in failing to consider the risks of concentration and in failing to consult with the beneficiaries supports the imposition of a surcharge (*see, Matter of Donner*, 82 NY2d 574, 585-587, *supra*; *Matter of Wood, supra*, at 167-168).

The imprudence in retaining the Kodak stock in August 1973 was aggravated by petitioner's inattention and inaction

for years thereafter. Although petitioner's investment guidelines provide that a concentration of stock might be defensible where, among other protections, the investment is closely monitored, petitioner exhibited total indifference to the prolonged and steep decline in the price of Kodak stock between August 1973 and early 1978. During that period, Kodak stock performed very poorly yet, as the Surrogate found, petitioner did nothing to protect the interests of Mrs. Janes and the charitable beneficiaries or to prevent the estate from incurring disastrous losses (see, Matter of Donner, supra, at 585-586). Petitioner took no significant action with respect to the portfolio until Kodak was at its post-1973 low (see, Matter of Donner, supra, at 585). By then, Kodak had long ceased to be a "great stock," but petitioner was "content to stand by as [a spectator] to the gradual obliteration of the [estate]" (Matter of Hubbell, 302 NY 246, 257, supra). Petitioner's indifference and inaction support the imposition of a surcharge (see, Matter of Donner, supra, at 585-587).

Additionally, petitioner did not alert Mrs. Janes or the charitable beneficiaries to the losses incurred by the estate or seek their direction. Indeed, petitioner succeeded in concealing those losses. In December 1973, petitioner advised Mrs. Janes that there was a "difference" of $350,000 between the value of the estate on the date of death and that on the alternate valuation date, but failed to disclose that the "difference" was a loss attributable to the decline in the price of Kodak stock. In a 1984 letter, petitioner advised Mrs. Janes that the marital trust had been depleted due to increases in her medical expenses, the effects of inflation, and the cost of maintaining her home, again with no mention of the decline in the value of the Kodak stock. Petitioner sent Mrs. Janes at least 21 other letters between 1973 and 1984, but never advised her about the loss to the estate resulting from the drop in the value of the Kodak stock, even though that loss at times exceeded $1,100,000. The failure to communicate with the beneficiaries was a breach of petitioner's fiduciary obligations (see, Matter of Wood, supra, at 167) and undoubtedly contributed to the losses sustained by the estate. Petitioner's nondisclosure, concealment, and misrepresentation support the imposition of a surcharge and the forfeiture of commissions (see, Matter of Donner, supra, at 587).

Petitioner contends that the Surrogate erred in finding that petitioner should have sold the stock by August 9, 1973. Petitioner contends that the Surrogate failed to cite any

authority compelling such immediate action, and that there is no basis in the record for the Surrogate's selection of that date. Petitioner cites cases holding that, where there is an obligation to sell an asset, the fiduciary must be given a reasonable time, perhaps up to 18 months, to carry out that transaction (*see, Matter of Weston,* 91 NY 502, 510-511; *Matter of Frame,* 245 App Div 675, 685; *Matter of Cuddeback,* 168 Misc 698, 701, *supra; Matter of Mendleson, supra,* at 976).

Here, the Surrogate properly found petitioner liable for imprudently holding securities that drastically declined in value over several years (*cf., Matter of Baker,* 249 App Div 265). The cases suggest that, under those circumstances, however difficult it may be to determine the exact date when it became imprudent to retain each share of stock, a court nonetheless may look to the fiduciary's entire course of conduct in order to determine liability, while selecting any date supported by the record upon which to hinge the calculation of damages (*see, Matter of Donner, supra,* at 585-586; *Matter of Frame, supra,* at 685-687; *Matter of Mendleson, supra,* at 975-976). The court may even select the date of death, issuance of letters, or inventory (*see, Matter of Donner, supra,* at 585-586; *King v Talbot,* 40 NY 76, 92, *supra; Matter of Mendleson, supra,* at 978), a fact that undercuts petitioner's assertion that a fiduciary cannot be required to divest immediately.

The date selected by the Surrogate is well supported by the record. By August 9, 1973, petitioner had proposed the sale of a portion of the Kodak stock in order to generate cash for the estate. Thus, by that date, petitioner was aware of the holdings, structure, and needs of the estate, and was prepared to implement its "plan" of investment and settlement. Experts for the objectants opined that by that date petitioner had all the information needed to warrant the sale of the Kodak stock down to 5% of the equity portfolio, and that a reasonably prudent investor would have done so.

In sum, the evidence and the law support the Surrogate's finding that petitioner was seriously derelict in failing to divest the estate of an extremely risky concentration of Kodak stock by August 9, 1973, and that petitioner further breached its fiduciary duty to objectants by its inattention, inactivity, and deception in the face of a prolonged and steep decline in the value of the estate.

## V

Petitioner further challenges the amount of the surcharge, contending that it is excessive and based upon an erroneous

measure of damages. Endeavoring to "apply a measure of damages commensurate with [the] loss and, to the degree possible, make the injured party whole" (*Matter of Janes, supra,* at 755), the Surrogate embraced a theory of damages based upon lost profits or appreciation. The Surrogate relied on testimony of objectants' expert, who determined the amount of money that the sale of 12,087 shares of Kodak stock would have generated in August 1973, then calculated the cumulative gain that would have been realized upon various hypothetical investments of those proceeds in, for example, the Standard & Poor (S & P) 500 Index, the Ibbotson Intermediate Government Bond Index, or petitioner's own Lincoln First Income Development Trust, or with interest compounded at the statutory rate. In each case, the expert took into account actual dividends received on the retained Kodak stock, as well as the value of the stock when ultimately sold or transferred. Those calculations resulted in figures varying from $4,065,029 (compound interest at the statutory rate) to $7,530,547 (S & P 500 Index). Notably, objectants' expert testified that a hypothetical investment of the proceeds in petitioner's own Income Development Trust would have resulted in a cumulative gain of $6,080,269.

■ The Surrogate found that "the bank's own diversified equity fund, the Lincoln First Income Development Trust, most closely reflects the type of performance indicator which establishes a standard that this fiduciary is put to" because "the fund reflects exactly what performance was achieved by the bank in a reasonable and fair manner over the same period of time" (*Matter of Janes, supra,* at 758). Therefore, the court surcharged petitioner $6,080,269 for breach of fiduciary duty (*Matter of Janes, supra,* at 758). That was error.

The proper measure of damages for a fiduciary's negligent retention of assets is the value of the capital that was lost (*see, Matter of Garvin,* 256 NY 518, 521; *Matter of Kellogg,* 35 Misc 2d 541, 553, *supra; see also, Matter of Donner, supra,* at 586). The value of the lost capital is calculated by determining the value of the securities at the time they should have been sold, minus their value when ultimately sold or, if they are still retained by the estate, their value at the time of the accounting or the court's decision (*see, Matter of Garvin, supra,* at 521; *Matter of Frame, supra,* at 686; *Matter of Mendleson, supra,* at 978; *Matter of Kellogg, supra,* at 553; *In re Davenport's Will,* 104 NYS2d 433, 437; *Matter of Booth,* 147 Misc 353, 357). The court should subtract amounts received by the estate as dividends or other income attributable to the retained assets

(*Matter of Garvin, supra,* at 521; *Matter of Kellogg, supra,* at 553). Ordinarily, interest may be recovered from the date on which the asset should have been sold (*see, Matter of Garvin, supra,* at 521; *Matter of Frame, supra,* at 688; *Matter of Mendleson, supra,* at 978; *Matter of Kellogg, supra,* at 553). Whether to award interest, however, is within the court's discretion; it is also within the court's discretion whether to award interest at less than the statutory rate, and whether to compound such interest (*see, Matter of Tannenbaum,* 30 Misc 2d 743, 754, *mod on other grounds* 20 AD2d 808, *affd* 15 NY2d 829; *see also, King v Talbot, supra,* at 92-95; *In re Davenport's Will, supra,* at 437; *see generally,* CPLR 5001 [a]).

The foregoing cases not only enunciate the proper measure of damages for improper retention of securities, they explicitly reject a measure of damages based upon lost profits or appreciation (*see, Matter of Frame, supra,* at 684; *Matter of Kellogg, supra,* at 553). Those cases also reject a measure of damages based upon the hypothetical performance of an investment of the proceeds of sale in the market (*see, Matter of Kellogg, supra,* at 553; *see also, Matter of Morgan Guar. Trust Co., supra,* at 1092). The Court of Appeals impliedly endorsed the reasoning of those cases in *Matter of Rothko* (43 NY2d 305), a decision erroneously relied on by the Surrogate.

In *Rothko,* the fiduciaries breached their duty to preserve estate assets, not by imprudently retaining assets when they were under a duty to sell, as in this case, but by selling assets that they were under a duty to retain. The fiduciaries in *Rothko* were not merely imprudent, but breached their duty of good faith and loyalty by engaging in flagrant self-dealing. The Court affirmed an award of appreciation damages, that is, damages based on the value of the improperly sold assets at the time of the trial court's decision, reasoning that " 'if it had not been for the breach of trust the property would still have been a part of the trust estate' " and that, "since the paintings cannot be returned, the estate is therefore entitled to their value at the time of the decree, i.e., appreciation damages" (*Matter of Rothko, supra,* at 321, 322). In justifying that departure from the traditional measure of damages, the Court stated: "The reason for allowing appreciation damages, where there is a duty to retain, and only date of sale damages, where there is authorization to sell, is policy oriented. If a trustee authorized to sell were subjected to a greater measure of damages he might be reluctant to sell (in which event he might run a risk if depreciation ensued). On the other hand, if there is a duty to

retain and the trustee sells there is no policy reason to protect the trustee; he has not simply acted imprudently, he has violated an integral condition of the trust" (*Matter of Rothko, supra,* at 321). Here, the fiduciary imprudently retained unproductive assets, as opposed to unlawfully selling productive assets, and there is therefore no basis for awarding damages based on lost appreciation. The Surrogate thus erred in relying on *Rothko.*

The damages assessment must therefore be modified. The law and the evidence support a surcharge calculated as follows: the value of the 12,087 shares of Kodak stock on August 9, 1973, the date on which they should have been sold, minus the value of the shares when they were ultimately sold or transferred, minus any income attributable to the stock retained, plus interest at the legal rate, compounded from August 9, 1973. Because there was uncontradicted expert testimony that computed damages of $4,065,029 in accordance with that standard, it is not necessary to remit the matter.

Accordingly, the judgment should be modified to surcharge petitioner $4,065,029 plus prejudgment interest from October 1, 1994 through August 17, 1995, plus $326,302.66 previously received by petitioner for commissions and attorneys' fees, plus postjudgment interest, costs, and disbursements.

GREEN, LAWTON, BALIO and DAVIS, JJ., concur.

Judgment unanimously modified, on the law, and as modified, affirmed, without costs, in accordance with the opinion by DENMAN, P. J.